404 So.2d 1360 (1981)
Napoleon "Nap" L. CASSIBRY, II
v.
STATE of Mississippi.
No. 52781.
Supreme Court of Mississippi.
October 7, 1981.
As Corrected On Denial Of Rehearing November 4, 1981.
*1361 Alvin M. Binder, Binder, Kirksey & DeLaughter, Jackson, Harold J. DeMetz, Gulfport, for appellant.
Bill Allain, Atty. Gen. by Karen A. Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and BOWLING and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
This is an appeal by Napoleon "Nap" L. Cassibry from a misdemeanor conviction in the Circuit Court of Harrison County of violating Mississippi Code Annotated § 97-11-19 (Supp. 1980), prohibiting a legislator from being interested in a contract with the state authorized by any law passed during his term of office or within one year after the expiration of such term. We affirm.
The issues raised on this appeal are:
(1) Whether the appropriation bill, voted on by the defendant, authorized a contract within the meaning of Mississippi Code Annotated § 97-11-19;
(2) Whether § 97-11-19 is unconstitutionally vague and therefore invalid;
(3) Whether the defendant was entitled to immunity as a matter of law because of his meeting with members of a Legislative Committee; and
(4) Whether the Circuit Court erred in refusing to permit defense counsel to examine a prosecuting witness's statement given to the Attorney General's office during the investigatory stage.
Under Title XX of the U.S. Code the United States Government has adopted comprehensive programs to assist handicapped children.[1] Such programs envision developing the intellectual, emotional, physical, mental, and social capacities of pre-school handicapped children; encouraging the participation of the parents of such children in their development; and acquainting the communities to be served with the children's problems and potentialities. Such children include those handicapped because of visual, hearing, or motor impediments, mental retardation, emotional disturbances, or of environmental, cultural or economic disadvantages. These programs have been generally called "Title XX Social Services."
Mississippi has taken advantage of these Federal programs through our State Department of Public Welfare, with this Department contracting for and supervising *1362 their administration with various organizations in the communities of our State. The Department under monetary appropriation laws of the Legislature provides a percentage of the Federal funds to dispense to the needy and administer these Title XX Social Services, the major portion being federally funded.
Mississippi Code Annotated § 43-1-17 provides:
The state department of public welfare shall cooperate with the federal government, its agencies and instrumentalities, in carrying out the provisions of any federal acts concerning public welfare, and in other matters of mutual concern pertaining to public welfare, including the adoption of such methods of administration as are found by the federal government to be necessary for the efficient operation of plans for public assistance and welfare services in accordance with the provisions of the Federal Social Security Act, as amended... .
This is the basic statute under which the State Department of Public Welfare acts in cooperating with the Federal Government in rendering various social services to the inhabitants of Mississippi, including those provided under Title XX of the U.S. Code.
The defendant was elected to the Mississippi Legislature as a State Senator in November, 1975, to Post 2 of District 32, Harrison County, for a full four year term beginning the first Monday in January, 1976. He served until February, 1979, when he resigned.[2]
On March 25, 1977, as a member of the State Senate he voted "aye" on House Bills 1389 and 1390, which became law on April 11, 1977, effective July 1, 1977, as chapters 227 and 228, Mississippi Laws, 1977. Both laws are appropriation laws, the first being an appropriation to the State Department of Public Welfare for the purpose of providing assistance and services, as required by law, for the fiscal year 1978; and the second, an appropriation to the Department for the purpose of providing for the purchase of services for the fiscal year 1978. The fiscal year 1978 commenced July 1, 1977, and ended June 30, 1978.[3]
In 1977-78 the State Department of Public Welfare had 220 contracts with various agencies, associations and local districts throughout Mississippi for the purpose of assisting needy and handicapped inhabitants. At that time, Fred W. St. Clair was the Department's Commissioner. 218 of these contracts were with nonprofit organizations, including school districts, planning and development districts, and local community organizations organized to operate and deliver specific humanitarian services. These nonprofit organizations were reimbursed by the Department for actual expenditures on a monthly basis. In order to be reimbursed, these organizations were required to submit monthly statements itemizing every expenditure, with supporting documentation, which in turn was checked by Department personnel.
Two of the 220 total contracts were entered into with profit corporations, one being Developmental Learning Associates, Incorporated (DLA). The defendant, Senator Cassibry, was involved with this corporation.
The Articles of Incorporation of DLA dated July 20, 1977, reflect that this was a corporation organized for profit under the Mississippi Business Corporation Act, with a capitalization of $5,000, consisting of 50 common shares with a par value of $100 each. On July 21, 1977, the Articles were certified by the Secretary of State, and the Board of Directors named were W.C. Maples, Henry V. Leon, Lillian A. Hayden and Max Edrington. The stated corporate purposes were "to ... conduct educational and training activities that relate to learning disabilities and/or deficiencies, behavior modification, and motivation enhancement *1363 in children and adults, together with consultation to improve understanding and attitudes through education."
The defendant was the attorney for this corporation from its inception; he prepared the Articles and submitted the document to the Secretary of State for approval.
Shortly prior to the formation of DLA, Commissioner St. Clair informed Mr. Cassibry that while the Department was legally authorized to contract with a profit corporation as well as a nonprofit organization, the Department suggested a nonprofit corporation. Mr. Cassibry informed the Commissioner that since professionals were involved, it would not be worthwhile or in their best interest to form a nonprofit corporation.[4] The Commissioner then agreed to contract with DLA as a profit corporation and to pay the corporation the fixed amount of $369,500.00. Thus, rather than being reimbursed actual expenditures, DLA was to submit periodic statements of services rendered, to be paid pursuant to the contract.
The legal division of the Welfare Department also recommended that a performance bond be required of DLA in the amount of the contract. Mr. Cassibry, however, prevailed upon the Department to reduce the performance bond to $10,000.00.[5]
On August 1, 1977, the Department and DLA entered into a contract for the period August 14, 1977  August 14, 1978, with DLA to be paid for all services rendered, the total compensation $369,500.00. As a prerequisite to the contract the Department required a detailed proposal from DLA setting forth the area to be served, its needs, and how DLA proposed to meet them. This proposal was made a part of the contract. (R. 393-430).
Under the proposal DLA obligated itself to provide social services and training to 1,281 handicapped children in George, Hancock, Harrison, Jackson, Pearl River and Stone Counties. The proposal begins by noting the professional recognition of the growing number of public problems encountered as a result of underprivileged and handicapped children whose growth and development are stunted through inattention and neglect in their early years, rendering them incapable of independence and productivity when they mature.
DLA proposed to identify these problems in early childhood of 1,281 children, deal with them through specialized training, and thereby have far-reaching impact on the children, their families and the State. Individualized training would be provided, breeding confidence, motivation for more learning, and responsibility. The program was to reach children who were ignored, or not otherwise adequately treated or trained by public or private institutions or methods. From the Head Start centers of the six counties serving 3,417 children, approximately 1,281 handicapped children, ranging from three to 5.11 years in age, with behavioral or social maladjustment were to be selected from observation and specialized testing, and thereafter trained and treated, so as to alleviate their handicapping conditions.
The proposal states that "the DLA Staff, with unique background, training, experience, and interest in these children will bring the best expertise to serve these handicapped children." (R. 387).
There were 39 Head Start centers in the six counties. DLA agreed to conduct two orientation sessions of two hours each for the teachers and administrators at each center, for which it was to be paid a total of $15,600.00 ($200.00 per session). The same was also to be conducted for the children's parents.
The 1,281 children were to be divided into 196 groups. For each of these groups, DLA obligated itself to conduct one four hour session each month for 9 months at a *1364 charge of $154 per session, making a total of 1,764 group sessions for the total sum of $271,656.00. Finally, there were tests which it agreed to administer to the children in each group involving perception and movement, for which it was to be paid $15,680.00.
The total of the above charges amounted to $318,536.00. DLA then had a total estimated administration charge of $50,964.00, making the total contract price $369,500.00. DLA was to make periodic or monthly statements setting forth which of the above services had been rendered, and was to be compensated accordingly.
In rendering these services, DLA obligated itself to utilize a chief psychologist, two optometrists, two developmental therapists, and a consultant pediatrician, and other trained and skilled personnel.
Thus did DLA propose and contract to assist 1,281 South Mississippi disadvantaged pre-school children afflicted, alone or in combination, with emotional, physical or mental impediments. This contract was DLA's raison d'etre, and its only source of income. Of the $369,500.00, the Federal Government was to furnish $277,125.00, and the State, $92,375.00. The State funds came as a result and a part of the appropriation under House Bill 1390, 1977 Miss. Laws Ch. 228.
Mr. Cassibry was in consultation with the Department relative to preparation of the contract, if not in fact assisting in its drafting. He obligated himself to be corporate counsel almost to the extent of becoming a corporate employee.[6]
Mr. Cassibry's contacts with the Department did not terminate with the execution of the contract. In fact, Department personnel were instructed that on any question involving DLA they were to contact Mr. Cassibry, rather than any of the skilled personnel directing DLA. He had numerous personal contacts with the Commissioner and other department personnel.
Mr. Cassibry personally delivered to the Department the first two statements rendered by DLA for professional services, and requested the Department to manually cut the check that day, as DLA needed the money. Ordinarily, statements were processed and checks prepared by computer. Thus, on October 7, 1977, Mr. Cassibry was handed a Department check for $16,400.00, and again on November 17, 1977, one check for $14,800.00. Additionally, Mr. Cassibry hand delivered all statements for professional services submitted by DLA to the Department, and personally picked up all but two of the checks. Including the above two checks, DLA was paid the total sum of $336,176.00 through June 20, 1978. Mr. Cassibry, in turn, was paid a $2,500.00 monthly salary and a $15,000.00 bonus in March.[7]
Mr. Cassibry retained the services of a local certified public accountant to keep the books of DLA. This accountant, upon observing the $2,500.00 monthly payments to Mr. Cassibry, questioned the propriety of such, and was informed by Mr. Cassibry that it was perfectly legal, and that he had an attorney general's opinion to such effect.
In some manner Commissioner St. Clair heard about Mr. Cassibry's $15,000.00 bonus, and instructed Mr. Cassibry to return that money to DLA, which he promised to do.[8]
*1365 As would be readily conjectured, an audit by the State was eventually forthcoming. While the full audit is part of this record (R. 589-641), the document was excluded by the trial judge, erroneously we believe, from consideration during the trial. The melancholy details of this audit we leave to the reader's imagination. At any rate, the audit, conducted by a field auditor of the Department of Public Audit and completed January 26, 1979, took exception to $200,844.75 of the expenditures of this corporation.
Section 109 of the Mississippi Constitution reads as follows:
No public officer or member of the legislature shall be interested, directly or indirectly, in any contract with the state, or any district, county, city, or town thereof, authorized by any law passed or order made by any board of which he may be or may have been a member, during the term for which he shall have been chosen, or within one year after the expiration of such term.
This Constitutional inhibition on public officers has been implemented by various legislative enactments since 1892, with only slight modifications on its basic tenet. The last enactment was 1975 Miss. Laws Ch. 388, presently Miss. Code Ann. § 97-11-19 (Supp. 1980), the pertinent portions of which read as follows:
If any ... member of the legislature ... shall be interested, directly or indirectly, in any contract with the state ... authorized by any law passed ... during the term for which he shall have been chosen or within one (1) year after the expiration of such term, he shall be guilty of a misdemeanor and shall be fined a sum equal to double the value of the contract or imprisoned in the county jail not less than one (1) month nor more than one (1) year... .
Instead of a criminal procedure against the officer, ... a civil proceeding may be instituted against such officer ... so offending for double the value of the contract by or on behalf of the state ... These remedies are alternative, not cumulative, and for double the amount of the contract so made; and the remedy in any case first instituted, whether civil or criminal, shall be exclusive, barring, if civil, any criminal prosecution; and if criminal proceeding, then any civil suit for same transaction.
Mr. Cassibry was indicted by the grand jury of the Circuit Court of Harrison County for violation of § 97-11-19, and subsequently tried therefor. A demurrer to the indictment was overruled. After both the state and the defense had rested (the defense offering no evidence), by agreement of counsel for the defense and the state, as well as by Mr. Cassibry himself, the jury was waived, and the judge concluded the case in the absence of the jury. The circuit judge found Mr. Cassibry guilty as charged in the indictment.
The Court fined Mr. Cassibry $739,000.00, twice the amount of the Welfare Department's contract with DLA, but suspended all of the fine except $45,000.00, the amount he received in checks from DLA.[9]
The first argument on appeal is that House Bills 1389 and 1390, being appropriation bills, did not "authorize" the contract with DLA, and therefore the defendant is not guilty under Miss. Code Ann. § 97-11-19.
As above noted, two separate sessions of the Legislature and laws passed thereunder made the contract with DLA possible: 1968 Miss. Laws ch. 562, § 6 (Miss. Code Ann. § 43-1-17 (1972)), passed many years before Mr. Cassibry was elected to the 1976-1980 term of the Legislature, and House Bills 1389 and 1390, passed in 1977 when he was a State Senator. House Bills 1389 and 1390 were both laws, and the fact they were appropriation bills did not prevent them from being laws as well. The enacting clause of each is: "Be it enacted by the Legislature of the State of Mississippi. *1366 ..."[10] Counsel for the defendant agrees that they were laws. Yet counsel argues House Bills 1389 and 1390, being appropriation bills under Section 69 of the Mississippi Constitution, could not have "authorized" this contract. Section 69 of the Mississippi Constitution reads as follows:
General appropriation bills shall contain only the appropriations to defray the ordinary expenses of the executive, legislative, and judicial departments of the government; to pay interest on state bonds, and to support the common schools. All other appropriations shall be made by separate bills, each embracing but one subject. Legislation shall not be engrafted on the appropriation bills, but the same may prescribe the conditions on which the money may be drawn, and for what purposes paid.
The answer to defendant's contention is that just as it was necessary for a law such as § 43-1-17 to authorize the execution of contracts as those entered into by the State Department of Public Welfare, it was also necessary for an appropriation bill to be passed authorizing the expenditure of money before the Department had authority to obligate the state to make payment of money. No payment of state funds under any of the contracts would have been legally permissible without the passage of House Bills 1389 and 1390. This Court settled this question in Colbert v. State, 86 Miss. 769, 39 So. 65 (1905), which declared invalid the Governor's premature calling of state bonds without legislative appropriation. It was there stated:
Legislative control over the treasury, which we recognize as the supreme legislative prerogative, involves the necessity of legislative appropriation in order to the payment of moneys out of the treasury. This is a fundamental principle of constitutional law.
* * * * * *
The Legislature, under our system, having control of the public revenues, can alone provide for the payment of the public debts. It therefore is the guardian of the public credit, and is charged with the entire responsibility for the maintenance of the public faith and honor. A mere failure upon its part to make appropriation for the payment of public indebtedness, persisted in, would amount to repudiation; for without a legislative appropriation the creditor of the state is without power to enforce collection.
Id. at 777, 781, 39 So. at 67, 68.
The Florida Supreme Court in State ex rel. Kurz v. Lee, 121 Fla. 360, 163 So. 859, 868, summarized an appropriation as follows:
An appropriation of money is the setting it apart officially, out of the public revenue for a special use or purpose, in such manner that the executive officers of the government will have authority to withdraw and use that money, and no more, for that object, and for no other. State ex rel. Norfolk Beet-Sugar Co. v. Moore, 50 Neb. 88, 69 N.W. 373, 61 Am. St.Rep. 538; State v. Allen, 83 Fla. 214, 91 So. 104, 26 A.L.R. 735. The object of a constitutional provision requiring an appropriation made by law as the authority to withdraw money from the state treasury is to prevent the expenditure of the public funds already in the treasury, or potentially therein from tax sources provided to raise it, without the consent of the public given by their representatives in formal legislative acts. Such a provision secures to the Legislature (except where the Constitution controls to the contrary) the exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government. (Emphasis added).
See also 81A C.J.S. States §§ 230 and 231 and cases cited thereunder.
In Norbeck & Nicholson Co. v. State, 32 S.D. 189, 142 N.W. 847 (1913), the South Dakota Supreme Court, construing a constitutional provision almost identical to Section *1367 109 of our Mississippi Constitution, held invalid a contract with a corporation for the construction of an artesian well, because the president of the corporation was a member of the legislature which appropriated money to construct the well. Also, in the case of State v. Board of Education of Dependent Distr., 389 P.2d 356 (Okl. 1964), the Supreme Court of Oklahoma construing a constitutional provision very similar to Section 109, rejected the argument that a school appropriation bill did not authorize a contract with a school teacher, the same argument made by the defendant in this case.
There is one case which suggests a contrary holding: State ex rel. Baca v. Otero, 33 N.M. 310, 267 P. 68 (1928).[11] The state constitution of New Mexico has a constitutional inhibition of legislators being interested in contracts quite similar to our Mississippi Constitution. One R.L. Baca while a member of the legislature voted for a general appropriation bill. The Supreme Court of New Mexico held this appropriation bill did not authorize his employment as a rural school supervisor, and therefore his employment was valid. It is to be noted in that case the legislator voted for a general appropriation bill. Since House Bills 1389 and 1390 were not general appropriation bills under Section 69 of our Constitution, we are not called upon to decide the question of whether a legislator is prohibited from having any financial dealings with the state wherein he is paid in whole or in part from funds expended under a general appropriation bill.
Counsel for the defendant next contends § 97-11-19 is unconstitutionally vague in failing to give reasonable notice of the extent of the prohibited "indirect interest." Or, put another way, where is the line of demarcation between an indirect interest which would be prohibited by statute, and an indirect interest which would constitute no offense? For example, we are told of legislators riding highways authorized by laws passed during their term. Then, in defendant's rebuttal there are suggested a multitude of possible legislator beneficiaries from laws passed during their terms of office such as farmers, businessmen, and lawyers.
The appellant does not challenge the legal authority of the Mississippi Legislature, acting in furtherance of Section 109 in our Mississippi Constitution, to make it a misdemeanor for a legislator to have an interest in a contract with the state authorized by a law passed during his term of office, for the period of his term of office, and for one year after the expiration of such term.
Their entire argument goes to uncertainty which could possibly exist in the application of this law where a legislator had an indirect interest in marginal cases. We are not concerned with such a case, however, and counsel's argument is irrelevant.
It is not necessary for us to define the meaning of "indirect interest" in this case, since as ably pointed out by the Attorney General, the record reveals Mr. Cassibry had a direct interest in the contract with DLA.
We suggest the following as an accurate test for determining whether a person is directly interested in a contract: does his compensation depend upon payment being made under the contract? On this test Mr. Cassibry made a passing grade. The record also reveals Mr. Cassibry had a considerable devotion supporting such interest. In every instance in which the public benefit was opposed to the benefit of DLA, Mr. Cassibry urged the course of action that benefited his client, DLA, and its principals. Simply as an attorney acting within lawful bounds, it would have been proper for Mr. Cassibry to act solely on behalf of DLA. As a State Senator with a public trust, however, his first and foremost duty was to the State of Mississippi. In this conflict of interest Mr. Cassibry favored DLA, and the people lost. Hence, the law's raison d'etre.
Generally speaking, a criminal statute is unconstitutional under the due process clause of the Fourteenth Amendment if it is so vague and uncertain that it does not inform those subject to it what acts it is *1368 their duty to avoid, or what conduct on their part will render them liable to its penalties. See 22 C.J.S. Criminal Law § 24(2). Yet, as held by the United States Supreme Court in Jordan v. DeGeorge, 341 U.S. 223, 231, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951), "The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." The Court then held that the phrase "moral turpitude" was constitutionally certain in meaning, stating that "doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional for vagueness." Id. at 232, 71 S.Ct. at 708.
Likewise in the case of Roth v. U.S., 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the words "obscene and indecent" were challenged as being unconstitutionally vague and uncertain. Rejecting this argument, the Court stated in pertinent part:
It is argued that the statutes do not provide reasonably ascertainable standards of guilt and therefore violate the constitutional requirements of due process... . The thrust of the argument is that these words are not sufficiently precise because they do not mean the same thing to all people, all the time, everywhere.
* * * * * *
... This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. "... (T)he Constitution does not require impossible standards"; all that is required is that the language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices ..."
* * * * * *
That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense.
Id. at 491-92, 77 S.Ct. at 1312-1313. See also Miller v. California, 413 U.S. 15, 27 n. 10, 93 S.Ct. 2607, 2616, 37 L.Ed.2d 419 (1972).
To uphold § 97-11-19, it is therefore clear we are not required to follow the argument of counsel for the defendant and search for the outer boundaries of its application. Put another way, we are not called upon to define the edge of a target in a case where the defendant has scored a bull's eye.[12]
The history of Section 109 of our Constitution and § 97-11-19 with its antecedent statutes reveals several civil court proceedings in which public officials were interested in public contracts. Noxubee County Hardware v. City of Macon, 90 Miss. 636, 43 So. 304 (1907); State v. Board of Levee Comm'rs, 96 Miss. 677, 51 So. 211 (1910); Golding v. Salter, 234 Miss. 567, 107 So.2d 348 (1958). However, there has been only been one prosecution under this statute, prior to the instant case, Treen v. State, 92 Miss. 756, 46 So. 252 (1908) (remanded because of insufficiency of indictment), and, this is the first case of its kind in this state involving a member of the Legislature.
Under the wording of the statute, and in all civil actions thereunder, the fact that *1369 there had been a good faith compliance with the actual contract by the official, and there was no question of the political subdivision receiving full value for monies expended  hardly the case here[13]  was deemed immaterial. Thus, in Noxubee County Hardware Company:
These questions (fact town received its money's worth) are all utterly immaterial and wholly out of place, when the effort is here to have enforced a wise and salutary policy of protection for all the people by the constitution in section 109. The public interest is supreme in controversies like this.[14]
90 Miss. at 640, 43 So. at 305.
There are several states with constitutional and statutory prohibitions similar to Section 109 and § 97-11-19.[15] A good statement of the reasons behind the constitutional and statutory prohibition is contained in Norbeck & Nicholson Co. v. State, 32 S.D. 189, 142 N.W. 847, 849-50 (1913):
... the illegality consists of or arises, not from the inherent nature of the subject-matter of the contract itself, but from the express prohibition against the parties, situated in certain fiduciary or trust relationship toward each other, entering into contracts at all with each other, either directly or indirectly.
* * * * * *
A member of the state Legislature, by virtue of his office, stands in a fiduciary and trust relation towards the state; in other words, he is the confidential agent of the state for the purpose of appropriating the state's money in payment of the lawful contractual obligations of the state, and it seems to be almost universally held that it is against sound public policy to permit such an agent, or any agent occupying a like position, to himself be directly or indirectly interested in any contract with the state or other municipality, during the period of time of the existence of such trust and confidential relationship. The private interest of such an agent should not become antagonistic to his public duty. Illegality of contract, arising from express prohibition of law based on public policy, renders the contract wholly null and void for any purpose... .
* * * * * *
That there was no personal moral turpitude or dishonesty of any kind involved in this case, and that the state may have made an advantageous contract and has suffered no loss by reason thereof is also immaterial ...
There was no error committed by the circuit court in overruling the demurrer, and the evidence supported a conviction under this statute.
The defendant next claims he was immune from prosecution because of his meeting with his colleagues on the afternoon of Tuesday, January 30, 1979, when he was told the Rules Committee of the Senate had voted to file a resolution of expulsion *1370 against him before the full Senate the following Thursday. As an alternative to this action he could resign, which he chose to do.
Following the state audit of DLA, an investigation by the Attorney General and District Attorney, and also by the Senate itself, Mr. Cassibry and DLA had become a cause celebre. The Legislature was in session, and the members of the Senate were under constant scrutiny by the press. At the Tuesday morning meeting of the Rules Committee the vote was unanimous to file the Resolution of expulsion against Senator Cassibry the following Thursday. In order to spare him, as well as the Senate, the publicity and trauma attendant to this proceeding, these gentlemen decided to meet privately with Senator Cassibry, inform him of the facts, and give him an opportunity to take the action he deemed appropriate.
The members of the Rules Committee also recognized the meeting would be emotional, difficult and distasteful. They each had a high personal affection for Senator Cassibry, and felt all should share in the burden and travail of the meeting with him, rather than place this burden on the shoulders of one or two members of the committee.
Thus, privately, on the afternoon of Tuesday, January 30, 1979, six Senators met with Senator Cassibry in a legislative room of the Woolfolk Building. Four of the six are attorneys; Mr. Cassibry, of course, is an attorney.
All of the Senators, especially those who are attorneys, were aware of the law granting immunity to witnesses who appear before legislative bodies or investigating committees. Furthermore, they had discussed the proposed meeting with Senator Cassibry with the Attorney General and his staff. There was no intent to do or perform any act or function which would grant immunity to Senator Cassibry in any possible civil or criminal proceeding.
As anticipated, the meeting was difficult and emotional. We have no doubt statements were made to each other, personal confidences exchanged. It was not, however, an investigation of any kind. Mr. Cassibry was not sworn in to testify, no stenographer was present, no minutes were made, and what he said to his colleagues was of no benefit whatsoever to the criminal prosecution. In fact, except for his protestations of innocence, no specific material fact is revealed in the record from this meeting.
The statute upon which the defendant relies in support of this contention is Mississippi Code Annotated § 5-1-25:
A person sworn and examined as a witness before either house, without procurement or contrivance on his part, shall not be held to answer criminally, or be subject to any penalty or forfeiture for any fact or act touching which he is required to testify....
The defendant relies on State v. Billups, 179 Miss. 352, 174 So. 50 (1937); Wheat v. State, 201 Miss. 890, 30 So.2d 84 (1947); and Kellum v. State, 194 So.2d 492 (Miss. 1967).
The facts of this case do not support a claim of immunity from prosecution and are distinguishable from the statute and the cited cases, wherein the witnesses testified under oath. Mr. Cassibry was never sworn, and therefore never required to testify. While a witness may voluntarily appear before a legislative committee, the fact that he appears voluntarily and without contrivance does not prevent his claiming immunity from prosecution because of testimony given before the legislative body. It must be remembered, however, that even though a witness voluntarily appears before some investigative body, once he is duly sworn, his conduct is no longer subject to his own will, but he can be compelled to give testimony, or be subject to contempt. If he testifies falsely, he has committed a felony.
There is another distinction in this case. While legislative bodies can no doubt have legal force and effect even though there is considerable informality, sufficient formality must be attendant to the meeting for it to be official. Presumably, the chairman calls the meeting to order, announces its purpose, declares it open for business, or at least something in this nature. The meeting for which Mr. Cassibry claims immunity was no more than a gathering or congregating *1371 of his colleagues to inform him privately of what had transpired relative to his problem, and what was going to happen. He was free to come or go as he pleased.
This Court has liberally construed the granting of immunity to witnesses appearing and testifying before legislative bodies, because of the public purpose and necessity behind our lawmakers securing relevant facts for legislation. The marked extension to the rule suggested by the defense, however, has no merit.
It is finally argued reversible error was committed by the circuit judge's refusal to permit the defendant to examine a written recorded interview given by Commissioner St. Clair to representatives of the attorney general's office during their investigation of DLA and the people involved therein, including the defendant.
There is no merit to this argument. In the first place a very wide discretion must be afforded trial judges in deciding when to permit a defendant to examine the statement of a prosecution witness. Occasionally such statements would only be given under assurances they will remain confidential. Two tests are important in determining whether the accused should have been given a copy of the statement: (1) did the statement contain information favorable to the accused not revealed in the trial? and (2) was the statement substantially the same as the testimony of the witness? In this case the written statement of Commissioner St. Clair was very much the same as his testimony during trial, with the only difference of note  which is not only admitted but indeed argued by the defense  the written statement was more condemnatory of certain activities than the testimony of Commissioner St. Clair. Thus, this case fails the tests set forth in the following cases: Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Anderson, 574 F.2d 1347 (5th Cir.1978); Garrison v. Maggio, 540 F.2d 1271 (5th Cir.1976), cert. den., 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258; DeBerry v. Wolff, 513 F.2d 1336 (8th Cir.1975); Calley v. Callaway, 519 F.2d 184 (5th Cir.1975), cert. den., 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760; Bracy v. State, 396 So.2d 632 (Miss. 1981).
The judgment of the lower court must be affirmed.
This is a profoundly disturbing case. DLA involved reputable people and highly trained people. They proposed to render a very valuable service to this State and we entertain no doubt they were capable of doing so. While the needless dissipation of taxpayers' moneys is regrettable enough, the tragedy really comes in that little children, who by the skill of DLA personnel might have been immeasurably benefited for later life, have been deprived of that one chance.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, BROOM, LEE and BOWLING, JJ., concur.
WALKER, J., took no part.

APPENDIX A

HOUSE BILL NO. 1389
AN ACT making an appropriation to the State Department of Public Welfare for the purpose of providing assistance and services, as required by law, for the fiscal year 1978.
Be it enacted by the Legislature of the State of Mississippi:
Section 1. That the following sum, or so much thereof as may be necessary, is hereby appropriated out of any money in the State General Fund not otherwise appropriated, to the State Department of Public Welfare to provide for the administration of welfare and social services as are required to be administered by the Department of Public Welfare for the fiscal year beginning July 1, 1977, and ending June 30, 1978 ____ $14,981,605.00
Section 2. The acceptance and expenditure of Federal Government and local funds which may become available during the 1978 fiscal year for the support of the programs administered by the Department of Public Welfare or for the administrative expenses thereof are hereby authorized and approved, provided such receipts and expenditures *1372 are reported and otherwise accounted for in accordance with Section 27-103-1 et seq., Mississippi Code of 1972, said funds being estimated to amount to the following sum for the fiscal year ending June 30, 1978 ____ $50,670,787.00
Section 3. Of the funds appropriated under the provisions of Section 1 and the funds authorized to be expended under the provisions of Section 2, not more than the amounts set forth below shall be expended for the respective major objects or purposes of expenditure:

 Personal Services:
 Salaries, wages and fringe benefits ......... $24,264,106.00
 Travel and subsistence .......................... 900,074.00
 Contractual Services ............................ 5,590,711.00
 Commodities ....................................... 575,000.00
 Capital Outlay:
 Other than equipment .............................. 4,200.00
 Equipment ....................................... 153,392.00
 Subsidies, Loans and Grants .................... 34,164,909.00
 ___________
 Total ....................................... $65,652,392.00

Of the funds herein appropriated, it is hereby provided that Five Hundred Thousand Dollars ($500,000.00) of said sums, shall be expended by the State Department of Public Welfare to fund the Special Education for Disabled Children Program and that of said sum so allotted to said program Four Hundred Thousand Dollars ($400,000.00) shall be expended from the State General Fund hereinabove set forth.

HOUSE BILL NO. 1390
AN ACT making an appropriation to the State Department of Public Welfare for the purpose of providing for the purchase of services for the fiscal year 1978.
Be it enacted by the Legislature of the State of Mississippi:
Section 1. That the following sum, or so much thereof as may be necessary, is hereby appropriated out of any money in the State General Fund not otherwise appropriated, to the State Department of Public Welfare for the purpose of providing for the Purchase of Services for the fiscal year beginning July 1, 1977, and ending June 30, 1978 ____ $500,000.00
Section 2. The acceptance and expenditure of Federal Government and local funds which may become available during the 1978 fiscal year for the support of the programs administered by the Department of Public Welfare or for the administrative expenses thereof are hereby authorized and approved, provided such receipts and expenditures are reported and otherwise accounted for in accordance with Section 27-103-1 et seq., Mississippi Code of 1972, said funds being estimated to amount to the following sum for the fiscal year ending June 30, 1978 ____ $34,568,308.00
Section 3. Of the funds appropriated under the provisions of Section 1 not more than the amounts set forth below shall be expended for the respective major objects or purposes of expenditure:

 Personal Services:
 Salaries, wages and fringe benefits .......... $6,577,008.00
 Travel and subsistence .......................... 140,000.00
 Contractual Services ........................... 28,066,800.00
 Commodities ....................................... 154,900.00
 Capital Outlay:
 Equipment ....................................... 129,600.00
 ___________
 Total ....................................... $35,068,308.00

Provided, however, that in the event any emergencies or unforeseen contingencies shall arise, with the approval of the Commission of Budget and Accounting, the amount included in any one object of expenditure set forth above may be increased in an amount not exceeding fifteen percent (15%), on the express condition that if any one such object is increased by such percentage or any part thereof, then other objects in the budget shall be reduced in a corresponding amount.
It is the intention of the Legislature to provide in this appropriation for a maximum of 851 employee positions in said agency for the fiscal year 1978. In the event any employee position within said agency shall become vacant during the fiscal year as the result of the death, resignation, retirement or discharge of an existing employee, no funds appropriated or authorized to be expended hereby shall be expended for the payment of the salary of a new or replacement employee until the same shall have been certified to be necessary and essential to the efficient operation of such agency by the agency head or governing board thereof and a copy of such certification has been filed with the Chairman of the Commission of Budget and Accounting.
*1373 Unless expressly authorized by the Legislature herein, no funds authorized to be expended hereunder shall be expended to pay the salary of any employee whose salary was paid or reimbursed wholly from federal funds during the preceding fiscal year, it being the intention of the Legislature that no funds available for expenditure hereunder shall replace federal funds for salaries which are withdrawn and no longer available, unless specifically authorized by the Legislature. New employee positions funded one hundred percent (100%) by or from federal or other nonstate funds may be authorized by the Commission of Budget and Accounting.
Section 4. The money herein appropriated shall be paid by the State Treasurer out of any money in the State Treasury to the credit of the State Department of Public Welfare upon warrants issued by the State Auditor of Public Accounts; and the said Auditor shall issue his warrants upon requisitions signed by the proper person, officer or officers, in the manner provided by law.
Section 5. This act shall take effect and be in force from and after July 1, 1977.
Approved: April 11, 1977.

APPENDIX B
Mr. Cassibry's compensation from DLA, with notations for services rendered, is as follows:

 All Checks from DLA
 Date Amount Notation
October 25, 1977 $2,500.00 Legal Services Rendered
November 7, 1977 $2,500.00 Legal Services Rendered
December 9, 1977 $2,500.00 Salary - Nov. 77
January 9, 1978 $2,500.00 Salary - Dec. 77
February 10, 1978 $2,500.00 Consultant Fee Jan. 78
March 10, 1978 $2,500.00 Consultant Fee
March 13, 1978 $2,500.00 Deferred Payment,
 August Consultant Fee
March 25, 1978 $15,000.00 Bonus for Services
 Rendered
April 10, 1978 $2,500.00 Consultant Fee Mar. 78
May 10, 1978 $2,500.00 Consultant Fee
May 31, 1978 $2,500.00 - BLANK -
June 14, 1978 $5,000.00 Legal and Professional
 Services
 __________
 Total $45,000.00

NOTES
[1] 20 U.S.C. §§ 1401, 1421, 1423, and 1424; Public Law 93-647; Public Law 94-401.
[2] While a State Senator, Mr. Cassibry also served as a member of three different State Commissions, two involving the State Department of Public Welfare: the Commission on Medicaid and the Mississippi Health Coordinating Council.
[3] Mississippi Constitution § 115. See Appendix A for complete text of House Bills 1389 and 1390.
[4] W.C. Maples, O.D. - optometrist
 Henry V. Leon, Ph.D. - psychologist
 Lillian Hayden - teacher  Perkinston Jr. College
 Max Edrington - no profession shown in record

[5] The contract as finally executed did not provide for any specific amount of the bond (R. 376). The record does not reflect if any bond was ever furnished, except Schedule 6 of the State Department of Audit's detailed audit shows fidelity bonds of $10,000 each in effect for the president and treasurer of DLA (R. 641).
[6] For example, Mr. Cassibry agreed to be available on a 24 hour basis to deal with legal, administrative, financial and planning processes and/or problems of the corporation; prepare all legal documents for and on behalf of the corporation; assist in the preparation of any and all proposals offered to secure the services of the corporation and prepare final proposals for presentation to prospective clients of the corporation, including original and all copies of any and all work proposals. The corporation was to have first call on his entire work time, including a no limitation of time for telephone and office consultation, and in court. He would be paid a yearly fee, payable monthly, and not entitled to bill the corporation for other services. (R. 472).
[7] See Appendix B for the list of Cassibry's compensation from DLA for services rendered.
[8] Dr. W.C. Maples, Dr. Henry Leon and Mrs. Lillian Hayden likewise were recipients of bonuses of $15,000.00 each on March 25, 1978.
[9] The indictment charged Mr. Cassibry as having received $46,150.00 for his services. $1,150.00 of this sum, however, was paid by W.C. Maples individually to Mr. Cassibry as attorney, or relating to a stock purchase. The ramifications of this ambiguous transaction, while interesting, are not necessary to this opinion.
[10] Section 56 of the Mississippi Constitution reads:

The style of the laws of the state shall be:
"Be it enacted by the legislature of the state of Mississippi."
[11] Note, 7 Nat.Res.J. 296, 300 (1967).
[12] While we are not called upon to determine whether "indirect interest" is unconstitutionally uncertain, we observe these words and others of similar meaning appear in numerous criminal statutes of the U.S. Code. To name a few, under the following statutes it is a federal crime:

(a) to act as referee in bankruptcy in a case in which he is "directly or indirectly interested" (18 U.S.C. § 154, as amended);
(b) for former officials of the U.S. Government to engage in certain activities in which they have "a direct and substantial interest" (18 U.S.C. § 207);
(c) for members of congress to "directly or indirectly" receive or agree to receive compensation (18 U.S.C. § 201);
(d) for officials in the Department of Agriculture to "speculate, directly or indirectly, in any agricultural commodity or product thereof ..." (7 U.S.C. § 610);
(e) for any employee or attorney of the Department of Agriculture to "directly or indirectly, be the beneficiary of or receive any fee, commission, gift, or other consideration for or in connection with any transaction or business under this chapter..." except his regular salary or fee (7 U.S.C. § 1986).
[13] The total administration charge allotted to DLA for servicing the six counties was $50,964.00. Mr. Cassibry used $45,000.00 for his services alone, which could only have resulted in administration costs being paid from services which should have gone to the children of the counties.
[14] It should also be noted this Court construed the criminal violation of § 97-11-19 in State v. McClinton, 334 So.2d 677 (Miss. 1976), and there held a violation existed when a defendant was (1) a member of the legislature, (2) interested directly or indirectly in a contract, (3) authorized by law passed (4) during his term or within one year following the expiration thereof.
[15] Similar constitutions: Idaho Const. Art. 7, § 10; Mich.Const. Art. IV, § 10; Neb.Const. Art. III, § 16; N.M.Const. Art. IV, § 28; Okla. Const. Art. 5, § 23; S.D.Const. Art. III, § 12; W. Va.Const. Art. 6, § 15.

Similar statutes: N.D. Cent. Code § 12.1-13-03 (1976); Tenn. Code Ann. § 12-4-101 and 102 (1980).
Almost all the states have protective legislation in this area, the majority of which are more definitive than Mississippi concerning "interests" and procedure. The most comprehensive legislation on this topic found by this Court was Md. General Assembly Code Ann. Art 40A, § 1-101 et seq. (Supp. 1980). While more detailed legislation would be helpful in peripheral cases, we find our present statute clearly encompasses the situation presented herein.