460 So.2d 126 (1984)
Harold David BARNES
v.
STATE of Mississippi.
No. 55137.
Supreme Court of Mississippi.
November 21, 1984.
*127 Travis Buckley, Dan C. Taylor, Ellisville, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Henry C. Clay, III, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and DAN M. LEE and ROBERTSON, JJ.
*128 ROBERTSON, Justice, for the Court:

I.
Affording one accused of crime a fair (though not necessarily perfectly fair) trial is the raison d'etre of our criminal justice system. We have rules forged through experience designed to assure fairness. Where those rules have been offended, justice and fairness are likewise offended, and we often reverse though there be substantial likelihood of guilt.
This case makes the point. There is little in this record that makes Harold David Barnes a loveable person. Yet at his trial on major drug offenses, the trial judge in two important particulars deprived Barnes of the opportunity to test fully the credibility of his accusor, one Arthur Ray Moody, a thrice-convicted drug offender himself and equally unloveable. The trial judge refused (a) to allow Barnes to develop fully the extent of the State's leniency/immunity deal with Moody, and (b) to require production of prior exculpatory and bias-reflecting statements Moody had given law enforcement officials. In so doing the trial judge substantially violated rules designed to assure fairness in Barnes' trial and comparably denied Barnes rights secured by and expressed in those rules. We reverse.

II.
The operative events which have given rise to this appeal occurred on October 27, 1982, in Laurel, Mississippi. Harold David Barnes, Defendant below and Appellant here, operated Sumralls Drug Store out of the facilities known as Odom's Pharmacy. The State contends that at approximately 6:40 P.M. on the day in question Barnes transferred to one Arthur Ray Moody two illegal controlled substances, to-wit: pentazocine (talwin) and methadone (dolophine). Barnes denies the charges and says that he only gave Moody a bottle of cough syrup.
On March 23, 1983, Barnes was formally charged with transfer of pentazocine, Miss. Code Ann. 41-29-115(A)(d)(6) (Supp. 1984), and methadone, Miss. Code Ann. 41-29-115(A)(b)(11) (Supp. 1984), in two separate indictments returned by the Jones County Grand Jury, all in violation of our Uniform Controlled Substances Law of 1971, as amended. Barnes entered a plea of not guilty to both the charges which, upon his motion, were consolidated for all purposes including trial.
On June 1, 1983, these two consolidated cases were called for trial in the Circuit Court of Jones County. On the following afternoon, June 2, 1983, after hearing all of the evidence and receiving the instructions of the court and the argument of counsel, the jury found Barnes guilty as charged on both indictments.
On June 6, 1983, upon his conviction of the crime of transfer of pentazocine, Barnes was ordered committed to the custody of the Mississippi Department of Corrections for a period of twelve years and, in addition, was ordered to pay a fine of $25,000.00. Miss. Code Ann. 41-29-139(b)(1) (Supp. 1984). On the same day, upon his conviction of the crime of transfer of methadone, Barnes received a twelve year sentence with the express provision that this sentence be served concurrently with his prison sentence on the first charge.
From these convictions and sentences, Barnes appeals.

III.

A.
The chief State witness against Barnes was Arthur Ray Moody, the party to whom the controlled substances were said to have been transferred. On this appeal, Barnes assigns as error that the trial court unduly limited his inquiry into what may have motivated Moody to give testimony favorable to the State. Translated, Barnes complains that the trial court refused to allow Moody's attorney to be questioned regarding an alleged agreement between Moody and the State wherein it is said that Moody agreed to testify against Barnes in exchange for favorable treatment on his own charge.
*129 The State's case does indeed largely rest on Moody's testimony. The record reflects that Moody has thrice been convicted of drug-related offenses and that on the last such occasion he received a three year prison sentence. On cross-examination, Moody testified that, in exchange for his testimony against Barnes, he (Moody) had been promised that he would be "given help" on the charges pending against him.
In this context, defendant called as his witness J. Ronald Parrish, Attorney at Law of Laurel, Mississippi. Parrish had represented Moody on a prior felony charge which had been dismissed and was also representing Moody on drug charges arising out of the instant facts and circumstances. Not being satisfied with Moody's vague admission that he would be "given help" in exchange for his testimony, Barnes sought to show through Parrish that there was an agreement that Moody would not be prosecuted at all.
It should be emphasized that, prior to the time Parrish was called to the witness stand, Moody had stated in open court and quite unequivocally that he waived any right he might have under the attorney-client privilege to prevent his attorney, Parrish, from testifying in the premises.
In open court, the following colloquy between Barnes' attorney and Parrish took place:
By Mr. Buckley for Defendant Barnes
Q All right, sir. And as his attorney what was your understanding would be the result if he were to testify against the defendant, Harold Barnes?
A As his attorney, Mr. Buckley, I decline to answer that unless the Court directs me to on the basis of attorney/client relationship.
Q I understand that. Of course, as I understand it the Court has heard and understood the client himself to have waived that as a witness.
MR. BUCKLEY:
So, now we ask that the Court overrule the objection of attorney/client privilege relationship and direct the witness to answer the question.
MR. CASEY for the State:
Your Honor, at that point in time the State of Mississippi would object to it on the basis that any information he may have would be hearsay information.
THE COURT:
What was the question?
MR. BUCKLEY:
What was his understanding as to what would be the results or the ultimate outcome of the drug indictment against Arthur Ray Moody in the event that he testified in this case.
THE COURT:
I sustain the objection.
There followed further efforts by Barnes' attorney to elicit the same information, each of which was similarly rebuffed. Thereafter, Barnes' attorney requested permission to make a showing of the evidence that would be elicited from Mr. Parrish were he allowed to testify for the obvious purpose of preserving the point for appeal. In due course, the following proffer was made:
MR. BUCKLEY:
If it please the Court, the defendant would now tender or proffer the testimony that we would have offered through the witness, Parrish, had he been permitted to testify over objection of the State of Mississippi, when the Court did sustain that objection, and that was to the effect that it had been conveyed to him by the State of Mississippi that in the event that his client, Arthur Ray Moody, testified for the State of Mississippi in this case, that the indictment presently pending against him for possession of Methadone would be  well the words he used were that nothing would be done on it  rather didn't say dismissed but nothing would be done on it. That the witness himself conveyed this to Mr. Parrish, that he had the same information, and Mr. Parrish conveyed it to the witness. [emphasis added]
*130 Having thus made his proffer, Barnes has properly preserved the issue for our review. Murray v. Payne, 437 So.2d 47, 55 (Miss. 1983); In Re Estate of Bowen, 234 So.2d 51, 52-53 (Miss. 1970).

B.
The record is less than crystal clear on this point, but it appears that the basis of the trial judge's ruling was that the testimony sought to be elicited from Parrish was objectionable hearsay. That had been the basis of the State's objection. Subsequently, in the record we find the trial judge "recalling" that he may have precluded the Parrish testimony on the basis of the attorney-client privilege.[1] In this state of the record, we consider both possible bases of the trial judge's ruling.
We will consider the hearsay objection first. The common sense of the matter is this: If one is charged with a crime and is represented by counsel and thereafter engages in negotiations with the State as a result of which that person will offer testimony in connection with the prosecution of another in exchange for leniency or immunity, that person's attorney would almost certainly have personal firsthand knowledge of "the deal". The fact that he learned of the terms of the deal as result of communications between himself and representatives of the State and thereafter between himself and his client would not render his knowledge hearsay. In the normal situation the attorney participating in such negotiations would know (a) whether an agreement was made and (b) the terms of the agreement. He is competent as a witness to testify regarding these matters.
On the other hand, if for whatever reason the attorney was not a party to the leniency/immunity agreement but only was told of it after the fact by his client, or by anyone else for that matter, that information would constitute hearsay and the attorney ordinarily would be precluded from giving testimony regarding the truth of these matters.
Even if the attorney had not been a part of the making of the agreement and had only been told of it after the fact by his client, he could nevertheless be called to give impeachment testimony. In the specific context of this case, Moody agreed that the State had promised to give him some help. He was vague and reticent about providing details. If, as Barnes sought to show, Moody had told his attorney that the charge would be dropped altogether, such testimony would be allowed for impeachment purposes even though hearsay.
The questions put by counsel for Barnes, and to which objections were sustained, were confusing at best. Reading them, one cannot tell with certainty whether they sought to elicit hearsay information. Under the foregoing pattern of analysis, however, if the questions did not seek hearsay, they surely were unobjectionable. If they did seek hearsay, the answers were admissible to impeach Moody.
When we come to the proffer made by Barnes' attorney, we find it stated rather unequivocably that Parrish, if he had been permitted to testify, would have stated that the State of Mississippi had promised Moody that, in exchange for his testimony against Barnes, Moody's case would in effect be dropped  "nothing would be done on it". More specifically, Barnes offered to prove through Parrish that the State had communicated the deal to him, Parrish. The obvious suggestion here is that Parrish, as Moody's attorney, was playing the normal role an attorney would be expected to play in such leniency/immunity *131 negotiations with the State. Under accepted rules of evidence, Parrish could give testimony regarding the truth of such matters.

C.
Having held that the Parrish testimony was not objectionable on hearsay grounds, we turn to the question whether it was nevertheless properly excluded on grounds of the attorney-client privilege.
At the outset several points need to be made clear. First, the privilege relates to and covers all information regarding the client received by the attorney in his professional capacity and in the course of his representation of the client. Included are communications made by the client to the attorney and by the attorney to the client. In that sense it is a two-way street.
In another sense, the privilege is only a one-way street, for it belongs to the client only. See Bennett v. State, 293 So.2d 1, 5 (Miss. 1974); Jones v. State, 293 Miss. 179, 183, 3 So. 379, 380 (1887); Caraway & Currie, Privileges, 48 Miss.L.J. 989, 1028-1031 (1977). Only the client may invoke the privilege. Once the client has effectively waived the privilege, the attorney is competent as a witness regarding matters otherwise within the scope of the privilege. The attorney has no standing to invoke the privilege if the client does not wish to.
The point is made by contrasting Young v. State, 425 So.2d 1022, 1028 (Miss. 1983) with the case at bar. The facts of the two cases are on this issue legally identical except that in Young the co-felon-turned-state's-evidence did not waive the privilege. Young quite correctly excluded the proffered testimony of the attorney regarding a leniency/immunity agreement. Because Moody waived the privilege, the opposite result obtains here.

D.
The testimony of Moody's attorney regarding whether there was a leniency/immunity agreement and, if so, regarding the terms of that agreement was thus admissible in the face both of hearsay and attorney-client privilege objections. We now consider the consequences of the trial judge's having excluded that testimony.
Barnes has been convicted largely on the testimony of a thrice convicted drug offender. Though Moody was not technically an accomplice, we doubt that there are any who would question that the testimony of witnesses such as Moody should be viewed with suspicion and, before such testimony may undergird a conviction, it must be reasonable and not improbable, self-contradictory or substantially impeached. Mason v. State, 429 So.2d 569, 571 (Miss. 1983); Catchings v. State, 394 So.2d 869, 870 (Miss. 1981).
Litigation regarding witness leniency/immunity agreements have heretofore arisen in the context of the State's having failed or refused to disclose the agreement. In that context, the law is clear that the immunity "deal" must be disclosed to the defense. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); DeMarco v. United States, 415 U.S. 449, 94 S.Ct. 1185, 39 L.Ed.2d 501 (1974); King v. State, 363 So.2d 269 (Miss. 1978); but see Gilliard v. State, 428 So.2d 576, 583 (Miss. 1983).
These cases are wholly consistent with our rule that evidence of a leniency/immunity agreement may be presented to the jury where such would tend to impeach or show bias in the testimony of a State's witness. That is what Barnes sought to do here through his attempted examination of Moody's attorney. The trial judge's refusal to allow such examination was error.
The State's response to all of this is at best feeble. First, the State argues that Barnes' proffer "amounts to no more than speculation or conjecture" and therefore profits him nothing under Pittman v. State, 350 So.2d 67 (Miss. 1977). The citation misses the point, for here Barnes was prevented from offering evidence which would take the matter out of the realm of speculation or conjecture, if that had not already been done when Moody reluctantly *132 conceded that he had been promised some "help".
The State further cites Priest v. State, 275 So.2d 79 (Miss. 1973), and argues that the proffer was a mere "recital of conclusions or generalities" and is thus inadequate. A review of the transcript as quoted above reveals that Barnes offered to show that Moody had been promised in exchange for his testimony that nothing would be done on the charge against Moody, that, in effect, that he would not be prosecuted. The proffer is simple and clear and we think more than sufficient to preserve the point. Murray v. Payne, 437 So.2d 47, 55 (Miss. 1983); In Re Estate of Bowen, 234 So.2d 51, 52-53 (Miss. 1970). Beyond which, we note that the State made no objection to the form of the proffer at trial.
Finally, the State invokes our harmless error rule. The State's point is that Moody had already admitted that there was some sort of deal and that no further testimony was necessary. What Moody admitted and what Barnes offered to prove through Moody's attorney were qualitatively different. How the jury might regard Moody's credibility upon knowing that he had been promised some "help" on his case, on the one hand, and how the jury might react if it heard testimony that he had been promised immunity from prosecution altogether, on the other hand, are as a matter of commonsense so substantially different that the State's harmless error point is seen without merit. All of this is particularly true in view of the fact that Moody is the sort of witness whose testimony ought generally be viewed with caution and suspicion even in the absence of any proof of a leniency/immunity agreement.
Because we now turn to a second error committed at trial, we do not formally reach the question whether the instant error standing alone requires reversal.

IV.

A.
Barnes further assigns as error the trial court's refusal to require the State to produce and make available to him the prior written statements of the witness Arthur Ray Moody.
Well prior to trial Barnes filed a written request for production of
3. Any and all statements of witnesses to be called by the State.
* * * * * *
9. Any and all exculpatory evidence.
It was subsequently developed that the State's chief witness, Arthur Ray Moody, had given three separate statements to Jones County law enforcement authorities. The first was given on December 30, 1982, and has been preserved in the form of the typed transcription of a tape recorded question and answer interview. The second occurred on January 21, 1983, and is in similar form. The third is dated March 16, 1983, and is a more conventional witness statement in narrative form.
It appears from the record that prior to trial defense counsel did not know exactly what statements from the witness Moody existed. The facts first began to come out in the course of the testimony of Officer Harold Buckhaults, of the Laurel Police Department, who had been the principal law enforcement officer involved in the taking of the statements from Moody. Barnes requested that the trial judge make an in camera inspection and evaluation of the statements to determine whether they were exculpatory and should be furnished to the defense. In point of time, this was before Moody took the witness stand.
The record reflects that the trial judge then examined the statements "in camera for the purpose of seeing if there were conflicts between the statements made by Arthur Ray Moody". He then overruled the request for production stating
The Court has compared the three statements and by way of summary as far as time elements are concerned, that statement made by the witness  or which appears to have been made by the witness, Arthur Ray Moody, indexed as *133 Number Nine, above mentioned, and Number Ten, above mentioned, consists of perhaps 75 to 100 pages which the Court admittedly has had to read hurriedly, and these reports cover in some aspects several years of time, and some instances being referred to as far as ten and twelve years prior to the date of the statements.
The Court cannot say with absolute certainty without perhaps a week of time to study in minute detail every statement made whether there is any conflict at all in these statements, but the Court is of the opinion that there is no material conflict in the statements  either of the three. [emphasis supplied]
For reasons to be explained presently, this action on the part of the trial judge was error. To make clear the nature and extent of the error, we review briefly the law on the subject.

B.
We begin with the terms and provisions of our rules on criminal discovery. Rule 4.06 of the Uniform Criminal Rules of Circuit Court Practice provides, in relevant part, as follows:
DISCOVERY
The prosecution shall disclose to each defendant or to his attorney, and permit him to inspect, copy, test, and photograph upon request and without further order the following:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial;
* * * * * *
(6) Copy of any exculpatory material concerning defendant.
* * * * * *
Upon request of the defendant, the prosecution shall furnish to the court in camera any prior written statements of witnesses. If these materials are found to be materially inconsistent with the witness' testimony, the statements shall be supplied to defense counsel prior to cross-examination. [emphasis supplied]
Three features of these rules need emphasis.
First, statements of witnesses the State contemplates calling are not per se discoverable. Knowles v. State, 341 So.2d 913, 916 (Miss. 1977). On the other hand, Cassibry v. State, 404 So.2d 1360 (Miss. 1981), holds that
... a very wide discretion must be afforded trial judges in deciding when to permit a defendant to examine the statement of a prosecution witness... . Two tests are important in determining whether the accused should have been given a copy of the statement: (1) did the statement contain information favorable to the accused not revealed in the trial? and (2) was the statement substantially the same as the testimony of the witness?
404 So.2d at 1371.
Second, insofar as a statement may contain exculpatory material, there is no discretion vested in the trial judge. The exculpatory material must be produced. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
Finally, Rule 4.06 is self-executing. If a written request for discovery of materials within the rules is made, compliance must be forthcoming even though no formal order is entered. Morris v. State, 436 So.2d 1381, 1387 (Miss. 1983). Insofar as exculpatory material is concerned, this Court in Scott v. State, 359 So.2d 1355 (Miss. 1978), quoted with apparent approval the language from the Agurs case to the effect that
if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made.

359 So.2d at 1361 (emphasis supplied).

*134 C.
The three statements in issue have never been seen by counsel for Barnes. They were examined in camera by the trial judge and, as indicated above, their disclosure was not ordered. The statements were nevertheless filed with the court in a sealed envelope. Incident to this appeal, we have examined the statements and, having done so, find that at least two of them should have been disclosed to Barnes.

1.
The December 30, 1982, interview with Arthur Ray Moody is obviously exculpatory. Moody was questioned at length about his knowledge of alleged drug violations on the part of Barnes, as well as his possible knowledge of other suspected felonies. Throughout, Moody denied any knowledge of any criminal activity on the part of Barnes. Moody repeatedly insisted that the only "drugs" he had ever purchased from Barnes was cough syrup or Novahistine and Robitussin.
Moody's December 30, 1982, statement was discoverable for three separate reasons:
(1) The statement was exculpatory material within the meaning and contemplation of Rule 4.06(6). On March 29, 1983, Barnes requested production of "any and all exculpatory evidence". The trial did not begin until June 1, 1983. Within a reasonable time after March 29, 1983, Barnes was entitled to receive discovery of the exculpatory material in the December 30, 1982, statement.
(2) The statement was Brady material. Under the rule taken from the Agurs case and quoted in our Scott case, Barnes was entitled to this material even had no request been made.
(3) The statement is materially at odds with Moody's trial testimony. Under Rule 4.06 the statement should have been supplied to defense counsel prior to cross-examination of Moody at trial.
As indicated above, the statement contains numerous questions regarding alleged criminal activity apparently unrelated to the charges in the instant indictments. If on remand the State requests that these other matters not be disclosed, and makes a substantial showing that such would prejudice other criminal investigations or would otherwise be inappropriate, the trial judge is vested with discretion to excise from that which is disclosed to Barnes matters unconnected with the exculpatory material.

2.
The January 21, 1983, transcribed interview with Moody presents a different problem. Here again, the investigation and inquiry concerned substantial criminal activities other than that with which Barnes is here charged. In the course of the interview, however, Moody did discuss his connections with Barnes in illegal drug activities. There, Moody gave statements substantially the same as his trial testimony, to-wit: that Barnes was guilty of the offenses charged in the indictments.
The important feature of the January 21, 1983, interview is Moody's questions about what the police would do for him if he "talked". The following exchange occurred:
Moody: You, you know, you gonna tell me what you gonna do for me, you gonna let me get out, you know, about these charges up against me, can you do that?
Agent: I can't promise you nothing, you know that.
Moody: Yea. I know.
Agent: Right off the bat.
Moody: Right.
Agent: But I'll go to bat for you if you give me what we want.

Moody: Man, I'll give you every damn thing you want. [emphasis added]
Barnes was entitled to have his attorney apprised of such a colloquy prior to cross-examination of Moody and he is so entitled prior to trial on remand. Discovery of the remainder of the January 21, 1983, statement is a matter committed to the sound discretion of the trial judge on remand, a *135 discretion to be exercised consistent with the principles and rules recited herein.

3.
The March 16, 1983, statement is a garden variety narrative witness statement. It does not contain any exculpatory material within the meaning of Rule 4.06 or Brady. It is not discoverable at this point. If on remand Moody testifies in a way materially inconsistent with the March 16, 1983 statement, its contents must be disclosed to Barnes' counsel prior to cross-examination of Moody.

V.
By reason of the two errors committed at trial as discussed above, see, Collins v. State, 408 So.2d 1376, 1380 (Miss. 1982), the judgments of conviction of Harold David Barnes of transfer of two illegal controlled substances must be reversed and these cases remanded to the Circuit Court of Jones County for a new trial.
REVERSED AND REMANDED
PATTERSON, C.J., ROY NOBLE LEE, P.J., and HAWKINS, DAN M. LEE, PRATHER and SULLIVAN, JJ., concur.
WALKER, P.J., and BOWLING, J., not participating.
NOTES
[1] Following Barnes' proffer, the following colloquy took place:

THE COURT:
... in the case of the attorney in this case, and he objected to that testimony, as I recall. Didn't you, Mr. Parrish?
MR. BUCKLEY:
Yes, he said he objected to it and would not answer unless so directed by the Court.
MR. PARRISH:
Yes, sir, I would not answer unless so directed on the basis of 
THE COURT:
And that's the basis of the Court's denying the admission of that evidence.