# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00745-COA

THE CITY OF PASCAGOULA, MISSISSIPPI
                                                            APPELLANT/
                                                            CROSS-APPELLEE

v.

ANNA BELLE CUMBEST
                                                            APPELLEE/
                                                            CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 07/08/2022 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL RILEY MOORE |
| ATTORNEYS FOR APPELLEE: | MICHAEL E. WHITEHEAD |
| | JOHANNA MALBROUGH McMULLAN |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED - 03/26/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     The City of Pascagoula appeals from the judgment of the Jackson County Circuit Court reversing the city council's adjudication that Anna Belle Cumbest's property was a "menace" in violation of Mississippi Code Annotated section 21-19-11 (Rev. 2015) and required a cleanup. Section 21-19-11 delineates the procedure for a municipality to use in determining whether private property presents a menace to the public health, safety, and welfare. If the municipality finds the property is a menace, the statute also sets forth the method the municipality is to institute to clean up the property. *Id.*; *see* Miss. Att'y Gen. Op.,

2009-00135, 2009 WL 1357184, *Alderman*, at *1 (Apr. 3, 2009).

¶2. Cumbest cross-appeals, asserting that she did not receive a "fair and impartial" hearing before the city council and that the circuit court erred in refusing to compel production of certain documents. Cumbest asserts these documents were necessary for her to prove her fair-and-impartial-hearing claim. The circuit court denied Cumbest's motion to compel, finding that the documents Cumbest sought were protected by the attorney-client privilege and that the privilege was not waived.

¶3. Regarding the City's direct appeal, we find that the circuit court erred in reversing the city council's section 21-19-11 determination. We therefore reverse the circuit court's judgment and reinstate the city council's section 21-19-11 ruling. With respect to Cumbest's cross-appeal, we reject her contention that she did not receive a fair and impartial hearing before the city council. Further, we find no abuse of discretion in the circuit court's decision denying Cumbest's motion to compel the production of certain documents. Accordingly, we affirm that order.

**PROCEDURAL HISTORY AND STATEMENT OF FACTS**

¶4. Cumbest owns property located at 2009 Beach Boulevard in Pascagoula, Mississippi. The home was destroyed when Hurricane Katrina made landfall on August 29, 2005, leaving only the slab on which her home sat.

¶5. On May 17, 2011, the city council conducted a hearing regarding Cumbest's property pursuant to section 21-19-11. Cumbest appeared through counsel at the public hearing. At the conclusion of the hearing, the city council declared the property a menace and allowed

2

Cumbest seven days to clean it up. Cumbest appealed that decision.

## I. June 2011 Memorandum of Understanding

¶6.    On June 21, 2011, the city council reached a settlement agreement with Cumbest to rescind its May 17, 2011 resolution directing that the property be cleaned up, provided, among other things, that Cumbest (1) construct a "six-foot high vinyl privacy fence around the slab located on the property," (2) "be responsible for the maintenance and upkeep of the fence," (3) place "no trespassing signs on the property," and (4) dismiss her appeal. The city council adopted a resolution outlining the agreement with Cumbest. On June 22, 2011, the City and Cumbest executed a Memorandum of Understanding (MOU) memorializing the agreement. The MOU specifically provides that "Cumbest agrees to maintain the fence on the Property and to replace the fence if damaged."

## II. 2021 Proceedings

¶7.    In 2021, Cumbest began receiving notices of code violations with respect to the property. Specifically, on January 14, 2021, the City's Code Enforcement Department sent Cumbest a notice of a code violation due to the "dilapidated privacy fence" surrounding the property that constituted a "non-conforming fence in disrepair." On April 19, 2021, the Code Enforcement Department sent another notice of a code violation regarding the "excessive growth" of "[h]igh grass and weeds" on the property considered to be "*a cause for concern because it creates a safety hazard and blight in the community*." (Emphasis in original). Both notices advised that the property would be reinspected in fifteen days and that further action would be taken if corrective action had not taken place.

¶8. When the violations were not remedied, Cumbest was notified on July 12, 2021, that the city council "has alleged that [Cumbest's property] . . . is in such a state of uncleanliness as to be a menace to the public health, safety, and welfare of the community." In accordance with section 21-19-11, Cumbest was notified that a hearing on the issues relating to the condition of the property had been ordered by the city council for August 3, 2021. Cumbest appeared at the hearing through counsel.

¶9. At the August 3 hearing, the City's Building Official Josh Church presented photographs and other exhibits and gave an oral report regarding the condition of the property. Regarding the slab on the property, he said that "nothing can be built on the slab anymore," "[i]t's not a buildable foundation," and "[i]t's become an eyesore." He also said that "[t]he plumbing [in the slab] has been exposed since Katrina and parts of it are crumbling over the years. It's in pretty bad shape."

¶10. Regarding the fence, Church showed photographs of its condition following repairs made the weekend before the August 3 hearing. Some of these photographs, marked "Today" in Church's slideshow, are included in the appendix to this opinion; others are included within the separate opinion. We observe that these photographs —particularly the "Today" photographs contained in the appendix—show the leaning fence, unpainted replacement boards, holes in the fence, and portions of the fence being supported by a makeshift support system.[1] Church also showed other photographs of the fence in its typical,

---

[1] In her separate opinion, Judge McDonald points out that Church did not use these particular terms in describing the "Today" photographs in his presentation before the city council. The photographs speak for themselves. The city council saw the photographs, and they are part of the record for our own review on appeal.

4

pre-repair state, including photographs showing major portions of the fence completely missing. Church explained that the "fence has, on multiple occasions, been on the ground." He added, "They get it put back up. It blows back down." He further explained, "The fence is getting in pretty dilapidated shape. They keep standing it back up and screwing it back together. Every time we get a strong wind or storm, it's back on the ground." Church acknowledged that the property "is a green lot. They keep the grass cut periodically, keep it in pretty good shape." Church then reiterated, however, that "[t]he fence and the slab [are] in pretty bad shape and neither one of them are usable."

¶11. Cumbest's counsel disputed that the slab or the fence created a "menace" and explained the sentimental value the slab had for Cumbest. He also showed current photographs of the property, noting the grass had been cut, and the fence panels that had fallen down had been put back up. These photographs are part of the record. Upon review, the photographs also showed bricks crumbling from the slab, vegetative growth through the slab, and overgrown and crumbling steps. Cumbest's counsel said that Cumbest had obtained an estimate from Lowe's to replace the fence if the city council thought that was necessary.

¶12. Following these presentations, discussion among the council members and Cumbest's counsel ensued. Councilman Matt Parker expressed concerns with allowing ruins from Hurricane Katrina to remain prominently displayed on Beach Boulevard and further noted, "Neighbors complain of raccoons and possums and everything else coming in [on the property] at all times of the night." Councilman Felix Fornett echoed these concerns,

explaining to Cumbest's counsel, "[A]s you know, we're not picking on anybody. We're just trying to make our city a better place to live. We're in a difficult situation as far as attracting people, as you very well know, so it's nothing personal. We're just today trying to make things better around here."

¶13.   At the conclusion of the hearing, the city council unanimously voted to "declare the property a menace to the public health, safety and welfare and authorize its cleaning, including, but not limited to, the fence and the slab."  To this end, the city council voided the 2011 MOU under the "binding successor doctrine"[2] and, alternatively, rescinded the MOU due to Cumbest's failure to maintain the fence, constituting a material breach of that agreement.  The city council adopted a written resolution documenting its findings and decisions, including its adjudication at a public hearing that the property constitutes a menace to the public health, safety, and welfare of the community pursuant to section 21-19-11.  As detailed in the August 3, 2021 resolution, the city council ordered the cleanup of the property (including the removal of the fence and slab) and authorized a presentation of the actual cost of doing so for adjudication so that it could become an assessment on the property.

### III.   Circuit Court Appeal

¶14.   Cumbest appealed the city council's section 21-19-11 adjudication to the Jackson County Circuit Court.  *See* Miss. Code Ann. § 11-51-75 (Rev. 2019).  Cumbest's notice of

---

[2] *See, e.g.*, *Ne. Mental Health-Mental Retardation Comm'n v. Cleveland*, 187 So. 3d 601, 604 (¶9) (Miss. 2016) ("Under the common law in Mississippi, governing bodies, whether they be elected or appointed, may not bind their successors in office by contract, unless expressly authorized by law, because to do so would take away the discretionary rights and powers conferred by law upon successor governing bodies.").

6

appeal included a designation of the record on appeal that included the following items:

> j.      A copy of all pre-meeting information packets provided to members of the Pascagoula City Council concerning and/or relating to the property located at 2009 Beach Boulevard, Pascagoula, MS, including any Memorandum and/or recommendation by the City Attorney or City Administration and/or setting forth what actions the City Council should take.
>
> . . . .
>
> l.      All written documents including, but not limited to, correspondence, letters, memoranda, electronic mail, text messages, or notes between the administrative/executive branch of the City of Pascagoula and the legislative branch concerning, involving or relating to any matter concerning the property located at 2009 Beach Boulevard, Pascagoula, MS, including any recommendations to the City Council.
>
> . . . .
>
> o.      All written documents including, but not limited to, correspondence, electronic email, text messages, plans, regarding any potential use of the Property for parking.

Additionally, Cumbest's designation sought to include "[a] privilege log of any documents or things requested above and withheld on the basis of privilege."

¶15. The City filed a cross-designation of the record. In that designation, the City objected to items j, l, and o identified in Cumbest's designation (as set forth above). The City asserted that to the extent any documents existed as described in those subparagraphs, "they were not part of the record before the City Council and, therefore, should not be included in the record on appeal. Further, these items are not reasonably limited in scope and time, and they seek documents protected by the attorney-client privilege and work product doctrine."[3]

---

[3] On September 9, 2021, the City filed a "Supplemental Designation of Record on Appeal and Supplemental Record." The supplemental record consisted of an affidavit executed by Code Enforcement Official Brett Stevens authenticating pictures of Cumbest's

¶16. Cumbest then filed a "Motion to Compel Documents and to Add Such Documents to the Appeal Record," seeking to compel the production of the documents identified as items j, l, o, and p (requesting a privilege log of all documents withheld on the basis of privilege) in her designation of the record and their inclusion in the record on appeal. The City subsequently produced a privilege log but it otherwise opposed the motion. Following a hearing, the circuit court denied Cumbest's motion to compel, finding that the documents were privileged and that the privilege had not been waived.

¶17. After the circuit court ruled on these evidentiary matters, the parties briefed and argued the merits of the city council's adjudication that the property is a menace pursuant to section 21-19-11. On July 8, 2022, the circuit court entered a written order on the merits of the appeal. As an initial matter, the circuit court found that the 2011 MOU "does not prevent a future City Council from instituting proceedings on the subject property under [section] 21-19-11." The City does not challenge this determination.

¶18. The circuit court, however, then reversed the city council's adjudication that the property constitutes a menace requiring cleanup pursuant to section 21-19-11. In this regard, the circuit court, quoting section 21-19-11(1), specified that the municipality was to consider

property taken on August 27, 2021, and again on August 31, 2021, that showed the condition of Cumbest's fence at that time. Cumbest filed a motion to strike the City's supplemental designation and record, which the circuit court granted. After the circuit court entered that order, the Mississippi Supreme Court decided *Board of Supervisors of Jackson County v. Qualite Sports Lighting LLC*, 337 So. 3d 1040 (Miss. 2022). In *Qualite*, the supreme court recognized that as in a traditional appeal, the record in an appeal pursuant to section 11-51-75 "can only include matters that were part of the record before the [governing authority]" and "is one in which new evidence cannot be considered." *Id.* at 1046 (¶23). In light of this holding, the City concedes that the circuit court correctly ruled on Cumbest's motion to strike.

whether the property "in its *then* condition" at the time of the hearing is in "such a state of uncleanliness as to be a menace to the public health, safety *and* welfare of the community." (Emphasis added by the circuit court). Finding that "[a]t the time of the hearing, the grass [on the property] was cut, the slab was surrounded by the fence, and the repairs had been made so that the fence was standing," the circuit court ruled "that the City failed to present substantial evidence that the . . . property was a public menace to the health, safety, and welfare of the community." On this basis, the circuit court reversed the city council's section 21-19-11 adjudication.

¶19. The City appeals this decision, asserting that the city council's section 21-19-11 adjudication is supported by substantial evidence and was not made in an arbitrary or capricious manner, nor does the city council's decision violate any constitutional right held by Cumbest.

¶20. Cumbest cross-appeals, asserting that even if this Court finds there was substantial evidence supporting the city council's section 21-19-11 adjudication, we should "nevertheless affirm the reversal of [the city council's] decision . . . because Mrs. Cumbest was not afforded a fair and impartial hearing." Cumbest further asserts that the circuit court erred when it denied her motion to compel and supplement the circuit court record on appeal with certain documents Cumbest believes led the city council to "predetermine" their section 21-19-11 adjudication. She contends that even if the documents were privileged, the City waived that privilege by referring to the documents during the public hearing. According to Cumbest, by denying her motion to compel these documents, the circuit court "impact[ed]

9

her right to present evidence of an unfair hearing."

## DISCUSSION[4]

I.      **Whether the Circuit Court Erred in Reversing the City Council's Section 21-19-11 Adjudication**

A.      **The Applicable Statute**

¶21.    Section 21-19-11(1) sets forth the guidelines to be used by a municipality in determining whether property requires cleanup, as follows:

> (1) To determine whether property or parcel of land located within a municipality is in such a state of uncleanliness as to be a menace to the public health, safety and welfare of the community, a governing authority of any municipality shall conduct a hearing, . . . [upon proper notice to the property owner] . . . .
>
> . . . .
>
>        If, at such hearing, the governing authority shall adjudicate the property or parcel of land in its then condition to be a menace to the public health, safety and welfare of the community, the governing authority, if the owner does not do so himself, shall proceed to clean the land, . . . by cutting grass and weeds; filling cisterns; removing rubbish, abandoned or dilapidated fences, outside toilets, abandoned or dilapidated buildings, slabs, . . . and other debris; and draining cesspools and standing water therefrom.

Miss. Code Ann. § 21-19-11(1).

B.      **The Applicable Standard of Review**

¶22.    We review a decision to clean up property pursuant to section 21-19-11 under "the same standard [that] applies in appeals from decisions of administrative agencies and boards." *Van Meter v. City of Greenwood*, 724 So. 2d 925, 927 (¶6) (Miss. Ct. App. 1998). Like the circuit court in this case, we are bound by the following standard of review: "The

---

[4] The applicable standards of review are discussed in context.

decision of an administrative agency is not to be disturbed unless the agency order was unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party." *Id.* (quoting *Bd. of Law Enforcement Officers v. Butler*, 672 So. 2d 1196, 1199 (Miss. 1996)). "Because a governing body's decision carries a presumption of validity, the party asserting the decision's invalidity bears the burden of proof." *Waring Invs. Inc. v. City of Biloxi*, 307 So. 3d 1257, 1260 (¶5) (Miss. Ct. App. 2020) (internal quotation marks omitted).

### 1.     Substantial Evidence

¶23.    "Substantial evidence has been defined as 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion' or to put it simply, more than a 'mere scintilla' of evidence." *Van Meter*, 724 So. 2d at 927 (¶6) (quoting *Johnson v. Ferguson*, 435 So. 2d 1191, 1195 (Miss. 1983)).  The City asserts that the city council's section 21-19-11 adjudication is supported by substantial evidence, and thus the circuit court erred in reversing the city council's adjudication on appeal.   Mindful of the limited review afforded to both the circuit court and this Court on appeal, we agree.

¶24.    We begin by noting that section 21-19-11 specifically lists "dilapidated fences" and "slabs" as items subject to cleanup under the statute.  At the public hearing before the city council, the City presented evidence that both conditions were present on Cumbest's property, and, further, the City presented evidence demonstrating how these conditions created "a menace to the public health, safety and welfare of the community."

¶25.    Regarding the fence, Church (the City's Building Official), presented photographs

11

showing large sections of missing fence panels, areas where the fence was leaning, and broken, discolored, or unpainted panels.

¶26.    The record also shows that on January 14, 2021—seven months before the public hearing—Cumbest received a notice of a code violation from the City due to the "dilapidated privacy fence" surrounding her property.  The notice provided for fifteen days to take corrective action, but Cumbest took no corrective action at all in response to this notice.[5]

¶27.    Cumbest was subsequently notified on July 12, 2021, pursuant to section 21-19-11, that the city council "has alleged that [her property] . . . is in such a state of uncleanliness as to be a menace to the public health, safety, and welfare of the community."  The notice further alerted Cumbest that a public hearing "on the issues regarding the condition of [her] property" would be held on August 3, 2021.

¶28.    We acknowledge that shortly before the August 2021 public hearing, Cumbest attempted to repair the fence.  But even the "Today" photographs Church presented (taken after the repairs) showed portions of the fence leaning and other sections were being supported by what appeared to be a quite rickety support system.  These photographs also showed discolored or unpainted replacement boards and holes in the fence.  Additionally, the city council heard Church's testimony at the hearing that the "fence has, on multiple occasions, been on the ground."  As he explained, "[t]hey get it put back up. It blows back down . . . .  The fence is getting in pretty dilapidated shape. They keep standing it back up

_____

[5] This code-violation notice was distinct from the July 12, 2021 notice of a public hearing subsequently issued pursuant to section 21-19-11.  Later in this opinion, we address the circumstances Cumbest described at the section 21-19-11 hearing in attempting to explain why no action was taken in response to the January 14, 2021 notice of violation.

and screwing it back together. Every time we get a strong wind or storm, it's back on the ground." *See Vazzana v. City of Greenville*, 116 So. 3d 1103, 1106-07 (¶15) (Miss. Ct. App. 2013) (affirming adjudication of property as a menace where, among other factors, "[t]he wire fence surrounding the perimeter of the yard is broken in several places").

¶29.    Further, as members of the community, the city council members were "free . . . to call upon their own common knowledge and experience" with respect to the windy, stormy conditions on the Coast and the dangers of detached portions of the fence becoming airborne, or the dangers presented by holes or gaps in the fence allowing access to the slab it surrounds. *See Waring*, 307 So. 3d at 1260 (¶7). Similarly, one council member noted that neighbors complained of "raccoons and possums and everything else" coming on the property at night. "The [c]ity [c]ouncil is . . . allowed to use its knowledge and familiarity of the neighborhood in making its decision," including pests on the property that could potentially expose humans or pets to diseases. *Burdine v. City of Greenville*, 755 So. 2d 1154, 1157 (¶6) (Miss. Ct. App. 1999). Cumbest offered no evidence that pests were not coming on the property.

¶30.    Regarding the slab, we reiterate that section 21-19-11 specifically lists "slabs" within the category of items addressed under that statute. As to the slab's condition and the related safety concerns, Church testified that "nothing can be built on the slab anymore," "[i]t's not a buildable foundation," and "[i]t's become an eyesore." He further stated that the "[t]he plumbing [in the slab] has been exposed since Katrina and parts of it are crumbling over the years. It's in pretty bad shape." Cumbest, herself, introduced into the record photographs

13

of the raised slab. These photographs show bricks crumbling from the slab, and crumbling brick steps overgrown by vegetation, thus further demonstrating its deteriorating condition. The city council members were properly relying on their own experience and knowledge that access through a dilapidated fence into this deteriorating raised structure with exposed plumbing and crumbling bricks poses a menace to public safety.

¶31. We also note that with respect to the "welfare of the community" factor contained in section 21-19-11, we find relevant the concerns council members expressed about allowing ruins from Hurricane Katrina to continue to exist along Beach Boulevard. As one council member explained to Cumbest's counsel at the public hearing, "We're just trying to make our city a better place to live. We're in a difficult situation as far as attracting people, as you very well know, so it's nothing personal. We're just today trying to make things better around here."

¶32. We recognize that pursuant to section 21-19-11, the city council was assessing Cumbest's property "in its then condition" when adjudicating whether it was a "menace" requiring cleanup. The circuit court and this Court, sitting as appellate courts, "review[] matters of statutory interpretation de novo." *Qualite Sports Lighting*, 337 So. 3d at 1043 (¶12).

¶33. The circuit court focused on the fact that the fence was standing at the time of the public hearing and reversed the city council's section 21-19-11 adjudication primarily based on this factor. We find that the circuit court erred in doing so.

¶34. In particular, we find that it defies common sense to strictly interpret the statutory

14

language "in its then condition" as limited to the fence's outward appearance at the time of the hearing where, as here, the *soundness* and *stability* of the fence relate directly to the "menace" the fence imposes. As such, we find that the city council properly considered the evidence presented on the fence's soundness and stability over the years.

¶35. We also find that the city council could properly consider Cumbest's failure to respond to the City's prior notices of violation, particularly the January 14, 2021 notice specifically identifying the "dilapidated" condition of the fence "in disrepair" in violation of standards delineated in the 2018 International Property Maintenance Code. The notice gave Cumbest fifteen days to take corrective action. Cumbest undertook no repair at that time, thus forcing the City to proceed to utilize section 21-19-11 to clean up the property. Only after being notified that the City was pursuing formal measures pursuant to 21-19-11 did Cumbest react—*seven months later*—by attempting to repair the fence in the days before the August 3, 2021 hearing. And it was not until the August 3, 2021 hearing that Cumbest even attempted to explain why she failed to timely address that notice.

¶36. In particular, at the section 21-19-11 hearing, Cumbest's attorney told the city council that Cumbest "got a little behind on maintenance" because she is 82 years old, has been in poor health, and is taking care of her sister. He also mentioned that "[e]verybody knows what's going on with materials nowadays and getting people to work and it just backs up. So I don't think [replacing the fence is] necessary, but she is prepared to do that." But there was no explanation why Cumbest, or someone on her behalf, did not communicate her offer to replace the fence *within the fifteen days to take corrective action following the January 14,*

*2021 notice of violation* or at least convey her inability to take *any* corrective action at that time. Nor was there any explanation of how Cumbest was able to have someone mow the grass and make some repairs to the fence seven months later (and not before) once she was faced with appearing before the city council in a public hearing. Under these circumstances and applying our standard of review, we find no basis for requiring the city council to condone this dilatory conduct by delaying its decision and cleanup measures any longer.

¶37. Cumbest received proper prehearing notice of the section 21-19-11 hearing.[6] Indeed, before the hearing, Cumbest *attempted* to clean up the property in a way *she* apparently believed was in accord with the statute in the days before the section 21-19-11 hearing. The city council, however, found that her efforts were insufficient. We find that the city council's decision was supported by substantial evidence for all the reasons we have given above.

¶38. We also recognize that in reversing the city council's section 21-19-11 adjudication, the circuit court, on pages six and seven of its July 8, 2022 judgment in Cause No. 21-138(2), cited *Yates v. City of Milwaukee*, 77 U.S. 497 (1870), for the proposition that "a municipality can[not] declare property to be a public menace by mere declaration that it is one." Cumbest relies on the same proposition on appeal. We find that *Yates* is distinguishable on its facts and law.

¶39. *Yates* concerned a Wisconsin statute conferring authority on a municipality "to

---

[6] Section 21-19-11(1) provides that notice of a section 21-19-11 hearing "shall be provided to the property owner by . . . United States mail" and posting notice on the property "two . . . weeks before the date of the hearing." The notice was posted and sent to Cumbest on July 12, 2021. The section 21-19-11 hearing did not take place until August 3, 2021; thus, Cumbest was properly provided prehearing notice.

16

establish dock and wharf lines on the banks of the Milwaukee and Menomonee Rivers." *Id.* at 504. The City of Milwaukee did so by ordinance. *Id.* at 505. Based on the boundary established by this ordinance alone, the city declared that a preexisting wharf extending beyond the established wharf lines was an obstruction and ordered its removal. *Id.* No hearing was afforded to the riparian property owner, and no evidence was submitted regarding the condition of the wharf. *Id.*

¶40. The United States Supreme Court reversed the city's decision, holding that "the mere declaration by the city council . . . that a certain structure was an encroachment or obstruction did not make it so, nor could such declaration make it a nuisance unless it in fact had that character." *Id.* The Supreme Court observed that if the city should "deem [the wharf's] removal necessary in the prosecution of any general scheme of widening the channel and improving the navigation of the Milwaukee River, they must first make him compensation for his property so taken for the public use." *Id.* at 507.

¶41. These circumstances are not present here. The city council did not adjudicate Cumbest's property a menace by "mere declaration." Rather, the formalities of section 21-19-11 were followed. The City held a public hearing and Cumbest appeared through counsel who argued her case and presented evidence on her behalf. The city council then adjudicated the property a menace and required its cleanup pursuant to section 21-19-11. We find that substantial evidence supports that decision. *Yates*, involving riparian rights subject to public commerce interests, simply does not apply in this case. *Id.* at 504.

¶42. Cumbest also asserts that the City conducted a warrantless search of the property in

17

obtaining evidence it relied upon in the hearing, and, according to Cumbest, under *Okhuysen v. City of Starkville*, 333 So. 3d 573 (Miss. Ct. App. 2022), that evidence should not have been considered by the city council. We find *Okhuysen* distinguishable and inapplicable here.

¶43.    In *Okhuysen*, this Court held that Article 3, Section 23 of the Mississippi Constitution, which, in general, prohibits warrantless searches, applies to administrative searches performed in relation to section 21-19-11 proceedings. *Id.* at 584 (¶32).  We concluded that the exclusionary rule applied to evidence obtained through the city's warrantless search, requiring reversal of its adjudication under section 21-19-11.  *Id.* at 589 (¶45).

¶44.    We begin by noting that *Okhuysen* is procedurally distinguishable.  In that case, the property owner raised the warrantless-search issue before the governing authority's section 21-19-11 hearing (i.e., the "trial" court).  *Id.* at 578 (¶9).  Cumbest made no such argument at the public hearing in this case or made any effort to have the evidence excluded.  The issue is therefore waived.  *Purvis v. Barnes*, 791 So. 2d 199, 202 (¶7) (Miss. 2001) (recognizing "that issues not presented in the trial court cannot be first argued on appeal").

¶45.    Procedural bar aside, we also find that Cumbest's assertions fail on the merits.  A city may utilize evidence "that can be observed from a public street."  *Okhuysen*, 333 So. 3d at 591 (¶49).  It appears that many of the photographs presented at the public hearing depict the fence as viewed from the street, as evidenced by the asphalt and curbs shown.  In the photographs showing the downed fencing, the slab is also visible.  Even with respect to photographs that do not show curbs or asphalt, they depict conditions that likewise can be viewed from the street, and Cumbest presented no evidence to the contrary.

¶46. Cumbest also asserts that we should disregard Church's statements regarding the usability of the slab. But we find no evidence in the record that Church obtained that information via a warrantless search, nor does Cumbest cite any evidence documenting this contention. Church's knowledge may be based on prior knowledge of the property, personal experience, or other background information. Due to Cumbest's failure to raise this issue at the public hearing, nothing in the record supports her assertion that this information was illegally obtained. For these reasons, we find that Cumbest's assertions on this point are without merit, and the city council appropriately relied on the photographs and information presented by Church in adjudicating the property a menace pursuant to section 21-19-11.

¶47. In sum, we find that the city council's section 21-19-11 adjudication that Cumbest's property was a menace due to the slab and dilapidated condition of the fence was supported by "more than a mere scintilla of evidence." The city council's decision was properly supported by the City building official's testimony about the condition of both structures, *see Van Meter*, 724 So. 2d at 927-28 (¶8) (finding that "[t]he statements of the City's code inspector regarding the condition of the structures were adequate to support the conclusion that the properties posed a menace to the public health and safety of the community"), photographs of the raised slab and the fence's condition both pre- and post-repair, and the city council members' own knowledge and experience. This evidence provides "adequate support" for the city council's conclusion that these conditions pose a menace to the public health, safety and welfare and safety of the community. Because the city council's section 21-19-11 adjudication was supported by substantial evidence, we find that the circuit court

19

erred in reversing that adjudication.

## 2.    Arbitrary and Capricious

¶48.    Cumbest asserts that the city council's section 21-19-11 adjudication was arbitrary and capricious. We disagree for the reasons addressed below.

¶49.    "[A]n act is arbitrary when it is not done according to reason or judgment, but depending on the will alone." *Vazzana*, 116 So. 3d at 1106 (¶12) (internal quotation mark omitted). "An act is capricious if done without reason, in a whimsical manner, implying either a lack of understanding or a disregard for the surrounding facts and settled controlling principles." *Id.* (internal quotation marks omitted).

¶50.    Cumbest claims that the city council's decision was made based on the "whims" of the current city administration as to what was "aesthetically pleasing to it." To be sure, Cumbest's property was referred to as an "eyesore," but the relevant point is that we find it was described as such based on substantial evidence of its dilapidated, deteriorating, and unsafe condition. Cumbest also asserts that the city council ignored "the surrounding facts and settled controlling principles" in reaching its decision, but we find that the opposite is true. As detailed above, the city council's decision was based on the factors set forth in section 21-19-11, which specifically authorizes the removal of dilapidated fences and slabs.

¶51.    We likewise reject Cumbest's assertion that "[a]fter a decade of the fence having been erected, the City suddenly changed course on its view of the Property without good reason." According to Cumbest, "[t]his is evidenced by the fact that the City refused to even consider having Mrs. Cumbest replace her fence." We are unpersuaded by this argument. As we have

20

discussed, the city council did, in fact, have "good reason" for finding that the fence was a menace, particularly due to its lack of stability and deteriorating condition over time. With respect to Cumbest's offer to replace the fence, we have already pointed out that on January 14, 2021—seven months before the public hearing, Cumbest was sent a violation letter specifically regarding the fence surrounding the property. That notice informed her that the fence violated the standards of the 2018 International Property Maintenance Code and was a "cause for concern because it creates a safety hazard and blight in the community." Particularly significant, the letter gave Cumbest time to take "corrective action," but no such corrective action was taken until the weekend before the public hearing and after the City notified Cumbest that it was pursuing formal measures pursuant to 21-19-11. Under these circumstances, we find that the city council's adjudication was neither arbitrary nor capricious.

### 3. Violation of a Constitutional Right

¶52.  Cumbest asserts that the city council's section 21-19-11 adjudication violated her "basic right to possess and use her property in any lawful manner." We find that this argument is unsupported by the applicable law and facts in this case.

¶53.  This Court has specifically recognized a municipality's legal authority to utilize section 21-19-11 to clean up properties upon proper notice. *Bray v. City of Meridian*, 723 So. 2d 1200, 1202-03 (¶¶17-18) (Miss. Ct. App. 1998) (citing *Bond v. City of Moss Point*, 240 So. 2d 270, 273 (Miss. 1970)).[7] Cumbest makes no argument that she lacked notice or

---

[7] In *Bray*, we observed that the supreme court in *Bond* affirmed "[a] municipality's statutory authority to demolish an unfit and unsafe building" where the property owner had

an opportunity to be heard in this case. Indeed, as detailed above, Cumbest was sent a notice of a violation regarding the fence's condition seven months before the section 21-19-11 public hearing, but she did not address the violation at that time. Cumbest was also notified of the section 21-19-11 public hearing, and she appeared through counsel at that hearing, where her counsel presented evidence and responded to the city council's questions. Although Cumbest attempted to fix the fence before the hearing, the city council properly considered evidence of the fence's long-term instability in reaching its decision. In short, the City used a constitutional process in adjudicating Cumbest's property a menace and requiring its cleanup. We find no constitutional violation here.

¶54. We further observe the circular reasoning underpinning Cumbest's constitutional argument and reject it for this additional reason. She argues that "[b]ecause the City's public menace decision was made without substantial evidence to support it, the City violated Mrs. Cumbest's sacredly held property rights to use and enjoy her [property] in any lawful manner." The relevant point here, however, is that Cumbest may not possess or use her property in an *unlawful* manner. *See Nat'l Refining Co. v. Batte*, 135 Miss. 819, 100 So. 388, 389 (1924) ("The right to use one's property, whether in a city or not, is not without reasonable limitations."); *see also Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 16 (¶31) (Miss. 2007) (recognizing that "a landowner . . . may use the premises they control in whatever fashion they desire, *so long as the law is obeyed*"(emphasis added)). As we have already detailed above, the city council's adjudication that Cumbest's property constitutes

been provided "reasonable notice" and failed to address the problem. *Bray*, 723 So. 2d at 1203 (¶18).

a "menace" requiring cleanup is supported by substantial evidence. In sum, we find that Cumbest's constitutional-rights-violation argument is without merit for the reasons stated.

## II.  Cumbest's Cross-Appeal

¶55.   In her cross-appeal, Cumbest asserts that the circuit court "erred in denying [her] motion to compel [certain documents, thus] impacting her right to present evidence of an unfair hearing."  In particular, Cumbest asserts that she did not receive a fair and impartial hearing before the city council, contending that certain questions and comments from council members at the hearing, as well as prehearing documents furnished to the city council, support this assertion.  She then contends that the circuit court erred in refusing to compel production of these prehearing documents that, according to Cumbest, were necessary for her to prove her fair-and-impartial-hearing claim.  The circuit court denied Cumbest's motion to compel, finding that the documents Cumbest sought were protected by the attorney-client privilege and that the privilege was not waived.  We address Cumbest's contentions in turn, and we find that both contentions are without merit.

### A.  Fair and Impartial Hearing

¶56.   "Administrative proceedings should be conducted in a fair and impartial manner, free from any suspicion of prejudice or unfairness." *Holt v. Miss. State Bd. of Dental Examiners*, 131 So. 3d 1271, 1279 (¶24) Miss. Ct. App. 2014) (quoting *Freeman v. Pub. Emp. Ret. Sys. of Miss.*, 822 So. 2d 274, 281 (¶21) (Miss. 2002)).  In assessing the fairness and impartiality of an administrative hearing, we must also bear in mind that "[t]here is a presumption that the officers conducting the hearing and the members of the Board behave honestly and fairly

in the conduct of the hearings and in the decision-making process." *Id.* (quoting *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 158 (¶53) (Miss. 1999)). "Absent some showing of personal or financial interest on the part of the hearing officer or evidence of misconduct on the officer's part, this presumption is not overcome." *Id.* We find that Cumbest failed to overcome the presumption that the council members acted fairly and honestly in this case. In particular, we find no evidence of a "personal or financial interest on the part of" any council member or any "evidence of misconduct on [their] part" so as to overcome this presumption. *Id.*

¶57. For example, Cumbest references comments from Councilman Parker regarding the loss of his own home in Katrina, the fact that her (Cumbest's) slab is "the last slab on Beach Boulevard," and his comment that "[a]t times we have to move on" as indicating he had "personal bias" and "may have a personal interest in Beach Boulevard property." Although perhaps somewhat callous, we do not find that Parker's questions and comments are evidence of any misconduct or personal or financial interest on his part indicating unfair prejudice or bias.

¶58. Nor do we find that references to her property as an "eyesore" at the hearing demonstrate bias, as Cumbest asserts. As we have already discussed, there is substantial evidence in the record supporting any "eyesore" description of her property in light of its dilapidated, deteriorating, and unsafe condition over the years. We find that this reference does not indicate unfair bias. As another example of purported bias, Cumbest refers to Mayor Willis's question about long-term plans for the property. He asked, "So tell me what

24

the long-term plan is. Do you have any idea where we're going with this, if we were to leave the slab?" We simply fail to find that this question constitutes evidence of "personal or financial interest" or "misconduct" on Mayor Willis's part.

¶59. Cumbest also asserts that there is a "suspicion" of prejudice concerning the hearing "because . . . the City provided the City Council with a prehearing road map on how to find Mrs. Cumbest's property a 'menace.'" Cumbest is apparently referencing a prehearing memorandum prepared by the city attorney that was provided to the city council, which we address in further detail below. To the extent Cumbest is suggesting that receiving legal advice prior to the hearing indicates unfair bias or prejudice, we reject this notion in its entirety. Receiving legal advice prior to the hearing does not demonstrate predetermination, nor does it evidence a "personal or financial interest" or "misconduct" on the part of any city council member. For all these reasons, we find that Cumbest's assertion that the city council deprived her of a fair and impartial hearing is without merit.

### B.      The Circuit Court's Denial of Cumbest's Motion to Compel

¶60. Cumbest asserts on cross-appeal that the circuit court erred in denying her "Motion to Compel Documents and to Add Such Documents to the Appeal Record" (motion to compel), and that this "impact[ed] her right to present evidence of an unfair hearing." To briefly summarize, Cumbest sought to compel the production of certain documents described in the designation of the record she filed in the appeal to the circuit court and to have these items included in the appellate record. The documents include four documents prepared by the city manager and sent to the city attorney and one email prepared by the city attorney to

25

the city council and other city officials marked "PRIVILEGED & CONFIDENTIAL." The City asserted that the documents were privileged and furnished a privilege log for these documents. After a hearing and based on its in camera review of the documents, the circuit court denied Cumbest's motion to compel, finding that the documents were protected by the attorney-client privilege and that the privilege had not been waived at the section 21-19-11 hearing.

¶61. A circuit court's "denial of a motion to compel is subject to an abuse of discretion standard of review on appeal." *Strickland v. Est. of Broome*, 179 So. 3d 1088, 1094 (¶19) (Miss. 2015) (quoting *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So. 2d 1192, 1209 (¶57) (Miss. 2003)). In this case, the circuit court confirmed in its order denying Cumbest's motion that it had reviewed the privilege log furnished by the City and had conducted an in camera review of the documents Cumbest requested. The circuit court found that all the documents were prepared by either the city manager or the city attorney and that they all were privileged. The circuit court further found that the privilege was not waived during the course of the hearing when the city attorney mentioned "what [he] had circulated previously" in summarizing potential action available to the city council with respect to Cumbest's property. We find that the circuit court appropriately denied Cumbest's motion to compel the documents based on its determination that they were protected by the attorney-client privilege and that the privilege was not waived as to these documents.

¶62. Mississippi Rule of Evidence 502 delineates the "[g]eneral [r]ule" of the attorney-client privilege as follows:

26

(b) General Rule of Privilege. A client has a privilege to refuse to disclose—and to prevent others from disclosing—any confidential communication made to facilitate professional legal services to the client:
> (1) between the client or the client's representative and the client's lawyer or the lawyer's representative;
> (2) between the client's lawyer and the lawyer's representative;
> (3) by the client, the client's representative, the client's lawyer, or the lawyer's representative to another lawyer or that lawyer's representative, if:
>> (A) the other lawyer represents another party in a pending case; and
>> (B) the communication concerns a matter of common interest;
> (4) between the client's representatives or between the client and a client representative; or
> (5) among lawyers and their representatives representing the same client.

MRE 502(b).

¶63. The scope of the attorney-client privilege is broadly interpreted and "relates to and covers *all information* regarding the client received by the attorney in his professional capacity and in the course of his representation of the client." *Hewes v. Langston*, 853 So. 2d 1237, 1244 (¶28) (Miss. 2003) (emphasis in *Hewes*) (quoting *Barnes v. State*, 460 So. 2d 126, 131 (Miss.1984)). Further, "[i]ncluded [within the privilege] are communications made by the client to the attorney and by the attorney to the client. In that sense it is a two-way street." *Id.* "[T]he privilege does not require the communication to contain purely legal analysis or advice to be privileged . . . . Instead, if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." *Id.* (citations and internal quotation marks omitted).

¶64. Cumbest asserts that because the city manager prepared four of the five documents,

those four documents are not protected by the attorney-client privilege. The documents, however, were sent to the city attorney as well as the city council. The attorney-client privilege is a "two-way street"—its protections include communications sent from a client to the client's counsel. *Id.* Further, as Rule 502(b)(4) provides, the attorney-client privilege extends to confidential communications made "between the client's representatives or between the client and a client representative." A "[c]lient's representative" includes an individual who has authority to "obtain professional legal services on behalf of the client" or "act on behalf of the client on the legal advice rendered." MRE 502(a)(2)(A).

¶65. These four documents, which consist of "agenda summaries," include the city attorney as a recipient and include privileged information relating to pending legal proceedings, including Cumbest's appeal under section 21-19-11 and other potential litigation.[8] The circuit court found that the documents were privileged after the in camera review. Based on our own review of these documents, we find no abuse of discretion on the part of the circuit court in making this determination where the city manager, as well as the members of the city council, constitute "client representatives," and the attorney-privilege extends to confidential communications "between the client's representatives." MRE 502(b)(4).

¶66. The fifth document included in Cumbest's motion to compel is the email marked "PRIVILEGED & CONFIDENTIAL" from the city attorney to the city council and Church. Cumbest does not challenge the circuit court's determination that this document is privileged.

---

[8] As the City noted in its privilege log, these documents also contain information relating to economic development projects and other confidential commercial and financial information. *See* Miss. Code Ann. § 25-61-9 (Supp. 2022); Miss. Code Ann. § 79-23-1 (Rev. 2013).

Rather, Cumbest contends that the privilege was waived when the city attorney referenced "[w]hat [he] had circulated previously" at the section 21-19-11 hearing and then outlined potential action to be taken should the city council determine that cleanup of the property was required. We are not persuaded by Cumbest's contention.

¶67. In particular, Cumbest asserts that the circuit court erred in finding that the privilege was not waived "because the City Attorney's actual and voluntary disclosure of the contents of the prehearing memorandum was an express waiver of any privilege." Cumbest's voluntary-waiver argument fails, however, because the plain language of Rule 502 provides that the *client*, not the attorney, holds the attorney-client privilege: "A *client* has a privilege to refuse to disclose—and to prevent others from disclosing—any confidential communication made to facilitate professional legal services to the client[.]" (Emphasis added). We find no Mississippi authority for the proposition that an attorney can unilaterally waive the attorney-client privilege,[9] nor does Cumbest cite any such authority in her appellate briefing. *See Reading v. Reading*, 350 So. 3d 1195, 1200 (¶22) (Miss. Ct. App. 2022) (citing MRAP 28(a)(7) and recognizing that "[t]he appellant must support his argument *with reasons and authorities* . . . . This is part of an appellant's burden on appeal." (citations and internal quotation marks omitted)). Accordingly, we reject Cumbest's contention on this point.

¶68. Cumbest also appears to assert that the city council, itself, put the prehearing email

<hr/>

[9] Indeed, as other states have recognized, "[a]n attorney, . . . unlike the client, cannot unilaterally waive [the attorney-client] privilege." *Woodbury Knoll LLC v. Shipman & Goodwin LLP*, 48 A.3d 16, 32 (Conn. 2012); *see Lightbody v. Rust*, 739 N.E.2d 840, 844 (Ohio Ct. App. 2000) ("It is axiomatic that only the client can waive the attorney-client privilege . . . . Absent express consent, it is not within the power of the client's attorney to waive that privilege.").

"at issue" when the Mayor asked the city attorney to recap possible action the city council could take with respect to Cumbest's property, and the city attorney complied. In support of her argument, Cumbest cites *In re Itron Inc*., 883 F.3d 553 (5th Cir. 2018), for the proposition that "a client waives the privilege by affirmatively relying on attorney-client communications to support an element of a legal claim or defense—thereby putting those communications at issue in the case." *Id.* at 558 (internal quotation marks omitted). But this theory applies when the advice itself serves as the basis for the client's claim or an affirmative defense. *See, e.g.*, *Jackson Med. Clinic for Women P.A. v. Moore*, 836 So. 2d 767, 773 (¶19) (Miss. 2003) (finding waiver where the plaintiff in a medical malpractice lawsuit "specifically pled reliance on [her lawyer's] advice as an element of her defense to [the defendant's] motion for summary judgment" in which the defendant claimed her lawsuit was barred by the applicable statute of limitation). That is not the case here. Simply because the Mayor acknowledged that legal advice had been given does not constitute waiver or make the actual substance of that advice discoverable. As such, we also find Cumbest's waiver-by-reliance argument without merit.

¶69. For all these reasons, we find no abuse of discretion in the circuit court's determination that the five documents at issue were privileged and the privilege had not been waived. According, we affirm the circuit court's order denying Cumbest's motion to compel the prehearing documents.

## CONCLUSION

¶70. In sum, we find on direct appeal that the city council's adjudication pursuant to

30

section 21-19-11 that Cumbest's property constituted "a menace to the public health, safety and welfare of the community" and required cleanup is supported by substantial evidence, was not made in an arbitrary or capricious manner, and did not violate Cumbest's constitutional rights, including, but not limited to, Cumbest's right to a fair and impartial hearing. Accordingly, we reverse the judgment of the Jackson County Circuit Court and reinstate the city council's section 21-19-11 adjudication. On cross-appeal, we find that Cumbest was afforded a fair and impartial hearing and affirm the circuit court's order denying Cumbest's motion to compel.

¶71. **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WILSON, P.J., WESTBROOKS AND McCARTY, JJ. LAWRENCE, J., NOT PARTICIPATING.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶72. The majority finds that the circuit court erred in its reversal of the city's adjudication of the Cumbest property as a menace, reasoning that a fence that has blown down in past hurricane seasons has the "character" of a menace and that the fence is thus unable to prevent the surrounded slab from being considered a menace as well. While I concur with the majority's reasoning regarding the issue of the City's privileged documents, I disagree with the majority's reasoning regarding the fence and its interpretation of the menace statute.

¶73. Although the majority discusses many issues at length, it spends only two paragraphs

31

addressing the key issue in this case: At what point in time should property be evaluated when determining if it is a menace? Neither party disputes that Cumbest repaired the fence prior to the August 3, 2021 hearing.[10] However, the question is whether the property could still be considered a menace at the time of the hearing.

**Additional Relevant Facts and Evidence**

¶74. The majority relies on Josh Church's testimony, photos presented at the hearing, and comments city council members as the basis for her reversal of the circuit court's ruling. I disagree with the majority's characterization of these facts and evidence.

### 1. Church's Testimony Regarding Photographs of the Fence

¶75. The majority characterizes Josh Church's testimony as conclusive on the issue of whether the fence was a menace. However, Church's testimony does not actually say that the property was a menace to the health, safety, and welfare of the community. In fact, Church primarily focuses his descriptions on the slab. Church presented several photos of the property both before and after Cumbest's recent repairs. He addressed the city council as follows:[11]

> Ladies and gentlemen, 2009 Beach Boulevard is a property that's at the corner of 11th and Beach. The house was destroyed during Hurricane Katrina. Left there is a chain wall, a slab.
>
> [In] 2011, they were allowed to put a fence around it to cover it. The fence

---

[10] The majority asserts, "Cumbest took no corrective action at all[,]" in response to the city's January 2021 notice. (Maj. Op. ¶26). However, even the city admits she made repairs prior to the hearing.

[11] I quote Church's testimony in its entirety, and the attached pictures refer to what he presented at the August 3 hearing.

has, in multiple occasions, been on the ground. They get it put back up. It blows back down. You can see there on the far right side, the fence is down and I think there was some on the front that was down, too.

The photograph Church is referring to (immediately below) was taken on May 11, 2021, when notice was first provided that the fence was in disrepair:



¶76. Church continued:

The thing with the slab is, nothing can be built on the slab anymore. It's not a buildable foundation. It's become an eyesore. The fence is getting in pretty dilapidated shape. They keep standing it back up and screwing it back together. Every time we get a strong wind or storm, it's back on the ground. We bring it to you tonight for you to make the decision, if it's a public menace, to remove the slab.

This is a green lot. They keep the grass cut periodically, keep it in pretty good shape. The fence and the slab is in pretty bad shape and neither one of them are usable. It is a block chain wall backfilled, with slab poured on top. There's nothing you can do with the slab. The plumbing has been exposed since Katrina and parts of it are crumbling over the years. It's in pretty bad shape.

33

Church then showed photos of the fence in the condition it was in at the time of the hearing, saying, "This is once the fence was put back up, I believe, over the weekend." He was referring to photos marked "Today" that were taken after Cumbest's repairs showing each side of the fence. One photo appears immediately below, and additional photos are in the attached Appendix.



¶77. The majority relies on these pictures to support its finding that the fence was a menace. Indeed, two sets of pictures were entered into the record on the day of the hearing. The City presented one set, which included photos from before and after the repairs, and Cumbest presented one set, which included photos of the fence after the repairs from inside the fence line (see Appendix). Cumbest's photos were submitted to show that the slab was secured and completely surrounded by the fence, e.g.:



¶78.   However, in both the City's and Cumbest's photos of the fence on the day of the hearing, the fence was upright, it had no holes, and no panels were leaning or collapsing. In fact, none of the photos show any evidence that the fence could not prevent would-be trespassers from accessing the property and, in turn, the slab.

¶79.   Further, Church at no point described the fence as a menace, or being unstable or

unsound. Church did not use any of the other words that the majority uses to describe the fence. Nor did Church testify that there were holes, leaning panels, or a "rickety support system." (Maj. Op. ¶28). Despite Church's testimony being almost entirely historical, the majority characterizes his testimony as if it was describing the present state of the fence.

### 2. Comments of the City Council

¶80. The majority also considers the comments of council members during the hearing as evidence that neighbors had complained about opossums and raccoons being on the property. While the majority is correct that city councils are allowed to take their own experience into consideration when making decisions regarding the facts of a case, Cumbest provided proof that she had made FOIA (Freedom of Information Act) requests and found that no complaints had been filed with the city regarding pests or varmints on the property.

### Discussion

¶81. I agree with the majority's recitation of the standard of review. However, I disagree with the majority's disregard for critical language of the statute as to the time at which the property should be evaluated to determine if it is a menace. Further, it should be emphasized that although we will not disturb a city's menace-finding unless it was "unsupported by substantial evidence; was arbitrary or capricious; was beyond the agency's scope or powers; or violated the constitutional or statutory rights of the aggrieved party[,]" *Van Meter v. City of Greenwood*, 724 So. 2d 925, 927 (¶6) (Miss. Ct. App. 1998), the ultimate authority and responsibility to interpret the law, including statutes, rests with the Court. *Wheelan v. City of Gautier*, 332 So. 3d 851, 859 (¶18) (Miss. 2022). Accordingly, we review the city's

interpretation of the statute de novo. *Id*.

### I.    The Menace Statute

¶82.    The circuit court based its decision to reverse the City's adjudication of the property as a menace on the circuit court's reading of Mississippi Code Annotated section 21-19-11, which states in part:

> If, *at such hearing*, the governing authority shall adjudicate the property or parcel of land *in its then condition* to be a menace to the public health, safety and welfare of the community, the governing authority, *if the owner does not do so himself*, shall proceed to clean the land[.]

(Emphasis added).   The circuit court emphasized the statute's "in its then condition" language and found that at the time of the hearing the photos and evidence submitted by both the City and Cumbest showed that the fence was standing and, thus, was not in violation of the statute. The majority takes issue with the circuit court's "strict[] interpretation" of the statute to limit an evaluation of the fence to its "outward appearance" at the time of the hearing, saying that the "soundness and stability" of the fence over the years relate to the menace finding as well.   (Maj. Op. ¶34) (emphasis omitted).[12]

¶83.    Even if we accept the majority's characterization of Church's testimony and agree that he implied that the fence had been "unsound" and "unstable" in the past, this testimony about

---

[12]    The majority characterizes Church's testimony as though it were evidence establishing that the fence, at the time of the hearing, was unstable and unsound based on the fence's history of falling down.  However, as we have discussed, neither Church's testimony nor the photos reflect any instability or unsoundness in the fence at the time of the hearing. Rather, Church simply testified that the fence was getting in bad shape, and it had fallen down in the past.  The photos presented reflecting the condition of the fence on the day of the hearing show no sign of collapsed sections or holes large enough for trespassers to access the property.

the history of the fence does not act as grounds, under the statute, to declare the property to be a menace *on the day of the hearing*. Doing so would effectively remove the "in its then condition" language from the statute. The City should not be allowed to rely on testimony regarding the fence's history rather than the fence's condition at the time of the hearing. Doing so would mean any property, despite repairs being done before the hearing, could be deemed a menace based solely on the past conditions of the property. There is no basis for this interpretation within the statute or anywhere in our caselaw.

¶84.    Essentially, the fence was back up by the time of the hearing, meaning there was no longer a violation of the statute. Pascagoula argued, however, that the issue of menace is "capable of repetition, yet evading review" because Cumbest can simply repair the fence any time it falls over, thus robbing the City of the chance to permanently resolve the issue. However, this argument ignores the obvious intent of the menace statute: to provide property owners an opportunity to remedy the issue before the hearing and thus avoid an adjudication.

¶85.    As the circuit court pointed out, "it is not unusual for fences to need repair following storms." Fences, unlike dilapidated buildings, can more quickly be repaired. If a court reads the statute in the way that the majority contends, the City could remove an offending fence regardless of whether the property owner already repaired the fence based on the finding that "the fence regularly blows down during hurricanes." This effectively removes the two-week window between the notice and the hearing where the property owner can repair the property. This haste is clearly not beneficial to the public interest, and the statute should not be read in a way that removes the obvious protections it provides to property owners.

38

¶86. Moreover, Cumbest was not required to act within the City's manufactured self-remedy period of fifteen days from the January 14 notice. Rather, Cumbest was only required to repair the property in a way that prevented it from being a menace *at the time of the hearing*, as the menace statute anticipated. Indeed, if the City held the hearing fifteen days after the notice, and Cumbest had not repaired the property by then, I would agree with the menace finding. But the City chose not to hold the hearing for another seven months. So, in effect, the City gave Cumbest the additional seven months to repair the fence. For all of these reasons, I disagree with the majority's interpretation of the statute.

## II.     Evidence of the Fence as a Menace

¶87. In reaching its conclusion regarding whether or not the fence was a menace, the majority relies on *Van Meter* and *Vazzana v. City of Greenville*, 116 So. 3d 1103 (Miss. Ct. App. 2013). But both of these cases are distinguishable from the present case because they relied on evidence presented at the hearing that reflected the condition of the property *at the time of the hearing*. The circuit court pointed this out in its analysis of *Van Meter*. The court distinguished *Van Meter*, stating that the properties in that case, at the time of the hearing, were "unoccupied and dilapidated and subject to vandalism, broken windows, and gang graffiti." *Van Meter*, 724 So. 2d at 926 (¶3). However, in the present case, none of these conditions existed on the Cumbest property at the time of the hearing before the city council. The circuit court reasoned that because the statute required the City to prove that "at the time of the hearing" the property qualified as a "menace," Church's testimony about the past or possible future condition of the fence was not sufficient to prove the property was a menace.

39

I agree with the circuit court's reasoning that *Van Meter* is distinguishable from the present case based on a plain reading of the statute.

¶88. The majority also cites *Vazzana* as standing for the proposition that a fence with holes in it is a menace. (Maj. Op. ¶28). However, that is not what *Vazzana* held. Rather, the Court in *Vazzana* found that the evidence of holes in the fence simply defeated Vazzana's argument that the property was not a menace because he had erected a fence. *Vazzana*, 116 So. 3d at 1106 (¶15). In essence, the Court held that a fence that does not prevent trespassers from accessing the property cannot be relied on to prevent a menace finding. *Id*. In the present case, the photographs of the fence on the day of the hearing clearly show that despite unpainted boards being used to secure the fence, the fence was secure, and the slab could not be accessed. Indeed, after review of the photographs submitted by both the City and Cumbest, there were no holes in the fence on the day of the hearing that could have allowed a trespasser to access the property and the slab. This situation is entirely different from the facts of *Vazzana*.

¶89. In both *Vazzana* and *Van Meter*, the city and circuit court found that the properties, on the day of the hearings, were in violation of the statute. In the present case, Cumbest was not in violation of the statute when it came to the conditions of which she had received notice, i.e., the fence or the grass. Further, because the fence prevented the slab from posing a threat to public health, safety, or welfare, the slab could also not be said to have been a menace at the time of the hearing. Because none of these violations were present on the day of the hearing, Pascagoula did not and could not have met the burden of proving menace, and

thus the circuit court was correct in its ruling.

## Conclusion

¶90.    Based on the above reasoning, I would find the City did not present substantial evidence at the hearing that the property was in violation of the statute at the time of the hearing, and the circuit court did not err in its ruling that the City had failed to meet its burden to prove menace.  Further, because the statute anticipates that the property owner may remedy the issue prior to a hearing being held, I disagree with the majority's reasoning that the fence was a menace under the statute at the time of the hearing.  For all these reasons, I would affirm the circuit court's ruling reversing the City's adjudication of the property as a menace.

**WILSON, P.J., WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION.**

The City presented the following five photos at the hearing reflecting the condition of the

fence following Cumbest's repairs.











Cumbest presented the following six photos at the hearing reflecting repairs made prior to the day of the hearing.











